Jesse Christopher SNODGRASS,
Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 90–SC–147–MR.

Supreme Court of Kentucky.

Aug. 29, 1991.

William R. Jones, Appellate Public Advocate, Highland Heights, for appellant.

Frederic J. Cowan, Atty. Gen., Carol C. Ullerich, Asst. Atty. Gen., Crim. Appellate Div., Frankfort, for appellee.

SPAIN, Justice.

Following a two-day trial on February 1 and 2, 1990, appellant, Jesse Christopher Snodgrass, was convicted by a Daviess County jury of three charges of sodomy and four other acts of sexual misconduct involving four young boys aged eleven to thirteen years. Following the jury's recommendation, the trial judge sentenced appellant to a total of twenty years' imprisonment, the minimum permissible punishment under the circumstances.

The incidents occurred between December 23 and 31, 1988, when appellant was twenty years old, at a "clubhouse" located in a pine thicket next to Our Lady of Lourdes Church in Owensboro. A fifteen-year-old girl observed some of the sex acts

and later, at her mother's urging, reported her observations to the police. They investigated, including interviewing the boys on videotape, and an indictment was returned exactly one year before the trial, on February 1, 1989.

Appellant took the stand and denied having had any sexual relations with the boys, but did admit that he had worked as a male prostitute once for about a week.

In attacking his conviction, appellant cites four claimed errors, two of which were never raised with the trial court and hence are not preserved for this court's consideration. *Wilhite v. Commonwealth,* Ky., 574 S.W.2d 304 (1978). The first unpreserved claim is that the punishment of a minimum term of imprisonment of twenty years for first degree sodomy is unconstitutionally cruel, especially considering that, under KRS 439.3401, one convicted thereof cannot be eligible for parole until fifty percent of the term has been served. The second unpreserved claim is that the said parole eligibility statute, titled "Parole for Violent Offenders," unconstitutionally includes first degree sodomy in its purview although the offense may be committed without any physical violence upon or injury to the victim.

The principal claim of error which was preserved is that the trial court abused its discretion by denying appellant's motion for a continuance on the morning of trial for the purpose of attempting to employ counsel to replace the appointed Public Defender. At arraignment appellant qualified as indigent, whereupon the court appointed counsel, who continued to represent appellant for the one-year period before trial. Appellant was at liberty on his own recognizance and met with his attorney at least five times. In addition, appellant and his attorney had conferred with the court and the prosecutor at a competency hearing three days before trial and no such motion was made or discussed. As a matter of fact, on that Monday, January 29, 1990, the court asked the appellant the following question regarding the upcoming trial set for Thursday, February 1st:

Q. And you think that you can discuss this case with him [Mr. Lashbrook] and relay information to him sufficient for him to prepare a defense for you in trial this week?

A. Yes.

TE III, 11.

On the afternoon before trial, appellant telephoned his attorney and left a recorded message requesting counsel to move for a continuance so he could employ a specific private attorney. The Public Defender got the message late in the day but filed the requested written motion on the morning of trial, after the jury panel was in attendance. The Assistant Commonwealth's Attorney objected to the motion, stating, "We have a room full of witnesses and have everybody subpoenaed in."

The record discloses that the appellant had talked with the private attorney shortly after arraignment about employing him but could not afford to do so. He telephoned him again about 2:15 p.m. the day before trial but again did not have enough money to retain him, according to what the private attorney told the Commonwealth's Attorney. The appellant nevertheless persisted that he did have "the means of paying him whatever he wants." Appellant further explained to the court that he wanted to employ private counsel because he felt that public defenders are overworked and that his appointed lawyer wasn't prepared for trial.

Upon questioning by the court as to whether there was any part of the defense that he was not ready to go to trial on, the defense counsel responded that he had not viewed the six-hour video of the four boys but that the Assistant Commonwealth's Attorney had relayed to him for the most part what the boys had said. Further, defense counsel stated that he had not viewed the scene. The prosecutor commented that the "clubhouse" had been destroyed in January 1989 (before the indictment was returned). There were photographs taken, however, that were admitted into evidence. Finally, the defense counsel stated that there was a potential witness, Sherry, that he had not contacted and that he couldn't say for sure

whether he had called his secretary and had her subpoena the girl.

After questioning defense counsel as to whether appellant's defense was simply that he denied the charged acts, the court was told that that was correct. The court then denied the motion for a continuance.

■ RCr 9.04 allows a trial to be postponed upon a showing of sufficient cause. The decision to delay trial rests solely within the court's discretion. *Williams v. Commonwealth*, Ky., 644 S.W.2d 335 (1982); *Cornwell v. Commonwealth*, Ky., 523 S.W.2d 224 (1975). Whether a continuance is appropriate in a particular case depends upon the unique facts and circumstances of that case. *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964). Factors the trial court is to consider in exercising its discretion are: length of delay; previous continuances; inconvenience to litigants, witnesses, counsel and the court; whether the delay is purposeful or is caused by the accused; availability of other competent counsel; complexity of the case; and whether denying the continuance will lead to identifiable prejudice. *Wilson v. Mintzes*, 761 F.2d 275, 281 (6th Cir.1985). To warrant substitution of counsel, appellant must show: (1) complete breakdown of communications between counsel and himself, (2) a conflict of interest, or (3) that his legitimate interests are being prejudiced. *Baker v. Commonwealth*, Ky.App., 574 S.W.2d 325, 327 (1978).

■ Under all the circumstances, including the fact that there had been four previous continuances by agreement of counsel, we believe the trial court did not abuse its discretion in denying this additional delay, especially on the strength of appellant's representation that he somehow finally had acquired the means of employing the specified private attorney who had indicated otherwise to the Commonwealth's Attorney. The record reflects that the Public Defender effectively and competently assisted the appellant during the trial. His guilt was established by the testimony of the four victims and the fifteen-year-old disinterested eyewitness and he received the minimum permissible punishment.

■ The last asserted error is that the trial court did not permit defense counsel to inform the prospective jurors on voir dire examination of the fact that under the "violent offender" statute a defendant would not be eligible for parole until he had served fifty percent of his term of imprisonment. The trial court correctly ruled that matters concerning parole eligibility should not be explored until the penalty phase of a bifurcated trial, although he did permit the jury to be informed as to the range of permissible punishment being from twenty years to life imprisonment. This disclosure was sufficient to ensure that qualified jurors were selected to afford both sides a fair and impartial trial. *See Shields v. Commonwealth*, Ky., 812 S.W.2d 152 (1991).

STEPHENS, C.J., and LAMBERT, LEIBSON, REYNOLDS and WINTERSHEIMER, JJ., concur.

COMBS, J., dissents by separate opinion.

COMBS, Justice, dissenting.

I respectfully dissent, and would reverse the judgment of conviction and remand for a new trial. It should be remembered that liberty and freedom were the things our founding fathers sought most to protect and preserve. It is fundamental that an accused is entitled to due process and a fair trial. The state has a duty to protect these rights, and that duty is shared by the court, the prosecutor and lastly defense counsel.

The majority has observed that four continuances had been granted by agreement. My view of the record shows that only one other was requested by appellant and only the Commonwealth received copies of the order granting. The majority characterizes the fourteen-year-old girl as a disinterested witness. My view of the testimony shows some friction and bitterness on the part of the witness, toward appellant. Likewise the majority ignores the fact that the fourteen-year-old girl identified the older brothers of two of the victims as having partici-

pated in this activity. Yet both brothers denied any such involvement.

Both the U.S. and Kentucky constitutions guarantee an accused the right to counsel. Unless this right is illusory, "counsel" must mean, among other things, counsel adequately prepared for trial. We are not dealing with a hardened adult criminal. We are dealing with a young man, obviously impoverished and nervous, who wanted private counsel but was unable to secure it until the last moment. He testified that he believed his appointed counsel was too busy to prepare his case adequately. The majority places great emphasis on a question propounded to appellant by the court on January 29:

> Q. And you think that you can discuss this case with him [Mr. Lashbrook] and relay information to him sufficient for him to prepare a defense for you in trial this week?
>
> A. Yes.

But the majority completely ignores the following dialogue between the court, appellant's counsel and appellant, during the in-chambers hearing on February 1:

> The Court: Well let me ask you this Mr. Lashbrook, is there anything about going to trial today that you're not ready for …?
>
> Mr. Lashbrook: There's only one possible thing and that is that there is a six hour video which I have not had the equipment nor have I had the time to view of the four boys. Now Mr. Jones [the prosecutor] has relayed for the most part what the boys have said on the video.
>
> .      .      .      .      .
>
> Mr. Lashbrook: The only other thing is possibly viewing the scene. Did you view the scene, Bryan [Jones]?
>
> .      .      .      .      .
>
> The Court: Well … is your client's defense simply that he denies doing it?
>
> Mr. Lashbrook: Right, that's correct.
>
> The Court: Are there any witnesses that you have that you haven't been able to get hold of or call to testify on your behalf?

> Mr. Lashbrook: No.
>
> Defendant: You didn't get hold of him?
>
> Mr. Lashbrook: Who is that?
>
> Defendant: Sherry (inaudible).
>
> Mr. Lashbrook: No I didn't get hold of her.
>
> Defendant: I just feel like there are a lot of things—
>
> Mr. Lashbrook: I don't—I can't say for sure whether I called my secretary and had her subpoena this girl or not.
>
> Defendant: We're just not adequately prepared.
>
> The Court: Well … I haven't had anything presented to the Court to give me reason, first off, why he shouldn't be adequately prepared and secondly that he is not in fact adequately prepared. Do you know anything about this witness, Mr. Lashbrook?
>
> Defendant: Just some of the things that were said on the tape that I know of, I mean, it proves that they are wrong. I don't know everything that is on the tape.
>
> Mr. Lashbrook: What can Sherry testify to is what he's asking?

At this point, it is apparent that: (1) defense counsel had not viewed *six hours* of videotaped interviews of the *victims* and other witnesses, all of whom he would be cross-examining at trial, and all of whose credibility was crucial to his defense of denial; (2) he had not examined the scene of the crime; (3) he had failed to contact a potential defense witness who, according to his client, could refute some of the statements made by the prosecution's principal witnesses.

Following the court's adverse ruling on the motion for continuance, the in-chambers hearing continued, and further revealed counsel's lack of preparation. The prosecutor asked that the victims be allowed to testify, as they had previously stated, that Snodgrass had told them: (a) of "certain sexual proclivities" (which included, as it turned out at trial, that the defendant had been a male prostitute); (b) that the defendant had spent time in jail; and (c) that the defendant had killed some-

one in the past. The prosecutor argued that such evidence was "relevant to the children's state of mind." Defense counsel made no comment or objection. A simple reading of the indictment and a review of the victims' statements would have demonstrated to him that there was no charge and no evidence of forcible compulsion or threats to induce the victims' participation; the children's state of mind was totally irrelevant and the admission of such evidence could be nothing less than palpable error, egregiously prejudicial to the rights of the defendant. (Restricted only with regard to the defendant's history of being in jail, the Commonwealth subsequently introduced extensive evidence of the defendant's statements as to prostitution and homicide).

As a final example of counsel's inadequate preparation, I quote again from the transcript of the in-chambers hearing:

The Court: Anything else?

Mr. Jones: I've got some pictures that Mary Dickens [the investigating officer] took ... on January 5, 1989, this is about three days after the investigation or the interviews [of] these kids really got going, and they were photographs of The Pines area, this is a little clubhouse made of pines and tires that we're alleging where all this stuff happened, if I could get those from Mary could I maybe show them to Mr. Snodgrass and Jim [Lashbrook] to see if we could go ahead and mark that as Exhibit 1?

The Court: Do you have any objection to the introduction?

Mr. Jones: Let you look at them.

Mr. Lashbrook: That's all true, just hold back stuff a lot of times and don't show it.

Mr. Jones: Well I mean Jimmy you've had—

Mr. Lashbrook: Well let's look at them.

Mr. Jones:—months to go over there and talk to her. I mean I don't think she's holding back anything.

The Court: Well, look at the picture, they don't sound very—

Mr. Lashbrook: They're critical, they're critical, I'd like to see them, they're crit-ical because we're ... talking about a place outdoors in the last, the very tail end of the year, with snow and everything on the ground.

The Court: Well go look at the pictures and we'll be ready to go in just a few minutes.

With regard to these photographs, as well as to the videotaped statements, I note from the record that defense counsel filed no pretrial motions for discovery, no motion for bill of particulars, and no motion for grand jury testimony. Failure to examine these "critical" photographs more than a few minutes in advance of trial and failure to file appropriate pretrial motions clearly indicates inadequate preparation. (The defense might also have benefited from knowing that the destruction of the clubhouse was at the direction of the authorities, after obtaining their photographic evidence but before the return of the indictment.)

Notwithstanding the foregoing, the majority believes: "The record reflects that the Public Defender effectively and competently assisted the appellant during the trial." I strongly disagree with this conclusion. For example, what did the missing witness know? What nuggets of opportunity for investigation and cross-examination lay unclaimed in the *six hours* of interviews with the prosecution's *star witnesses?* Were the majority in this defendant's place, how competent and effective would be counsel who permitted evidence of homicide to be introduced unchallenged? Considering all the circumstances I can only conclude that defense counsel was so woefully unprepared as to virtually assure the defendant of an unfair trial. This state of affairs was made evident at the in-chambers hearing, and the trial court erroneously and prejudiciously abused its discretion in denying the requested continuance.

I believe the trial court committed another grievous error in denying appellant's counsel the right to inform the jury on voir dire that conviction of sodomy in the first degree would entail mandatory parole ineligibility until the defendant had served fifty percent of his sentence (at least ten years,

assuming a minimum twenty-year sentence upon conviction of a Class A felony). KRS 439.3401 entails mandatory parole ineligibility until one-half of the sentence had been served. This is the law and the court erred in not so advising the jury.

Moreover, the jury was advised incorrectly on the range of penalties. The trial court ruled ambiguously that the jury might be informed of the "range of penalty for each of the offenses ... that he could be found guilty and punishment could be anywhere from one year up to life." Surely one year-to-life is *not* the penalty for *each* offense, or for *any* of them. This misinformation misleads the jury into believing that its sentencing discretion will be virtually unlimited, no matter the conviction. It further deprives counsel of optimal use of peremptory strikes after identification of jurors uncomfortable with the *true* penalty range for a particular offense. Once more, this defendant was disadvantaged.

Finally, experience should have taught us that the greatest deterrent to crime is the certainty of punishment and not the severity of punishment. To require a twenty-year-old, just a few years older than the willing victims and with no significant prior criminal history, to serve ten years in prison for a non-violent crime approaches cruel and unusual punishment, prohibited by our constitutions. This consideration is especially relevant where, as here, the jury returning the guilty verdict is unaware of the severity of even the minimum authorized penalty. This jury believed it would have the discretion to sentence the defendant to as little as one year, only to find that it must sentence him to at least twenty years, and that he must serve at least ten. In deliberating guilt or innocence, this jury was unaware of the magnitude of its responsibility. The jury's role in the criminal *justice* process was denigrated, and with it the defendant's right to a fair trial.