Frank **ELDRED**, Appellant,

v.

**COMMONWEALTH** of Kentucky,
Appellee.

No. 91–SC–678–MR.

Supreme Court of Kentucky.

Oct. 27, 1994.

As Modified on Denial of Rehearing
Sept. 21, 1995.

Marie Allison, Assistant Public Advocate, Department of Public Advocacy, Frankfort, for appellant.

Chris Gorman, Attorney General, David A. Sexton, Assistant Attorney General, Criminal Appellate Division, Frankfort, Robert L. Bertram, Commonwealth Attorney, Jamestown, for appellee.

STUMBO, Justice.

This appeal arises from the judgment of conviction of Appellant, Frank Eldred, for murder, for which he received a sentence of imprisonment for life without the possibility of parole for twenty-five years. He appeals to this Court as a matter of right.

On July 23, 1988, Herbert Cannon was killed when his automobile was burned. The automobile was completely destroyed by the extremely hot fire, which also incinerated the body, although the official cause of death was smoke inhalation and carbon monoxide intoxication. The Commonwealth's theory of the case was that the decedent was killed by Appellant and a confederate, Tommy Perdue, at the request of Cannon's ex-wife, Sue Melton, for the sum of $5,000.

The Commonwealth's case was premised initially upon the testimony of Appellant's girlfriend, Cynthia Moore. She came forward in August 1990 and accused Appellant of the murder based upon statements he had made to her during the course of their relationship. There was additional evidence derived from the investigation of the crime, although it apparently was insufficient to make a case since no indictment was sought until after Moore came forward.

In any event, Appellant was arrested on November 15, 1990. An indictment was filed the next day charging Appellant, Melton, and Perdue, each with murder as a principal, complicity to murder, first degree arson as a principal, and complicity to first degree arson. Since it was asserted that the murder was "for hire," and proper notice having been timely filed, the death penalty was a potential sentence. *See* KRS 532.025(2)(a)(4).

On December 7, 1990, a trial was scheduled to begin on June 10, 1991. Eventually, the trials of the three co-defendants were severed, and Appellant's was slated to go first. A pre-trial conference was held on Friday, May 31, 1991, at which time it appeared that the trial of Appellant would proceed, and further that neither of the other two co-defendant's would enter any plea agreement. Thereafter, on Wednesday, June 5, 1991, counsel and the trial court held a conference call concerning the status of the case. During the call, there was no mention of any potential plea agreements. At a subsequent hearing on various motions, including one to exclude all out-of-court statements by the co-defendants, on Friday, June 7, 1990, it was first revealed that the Commonwealth might reach an agreement with Melton, which would include her testifying for the Commonwealth at Appellant's trial. Although there was no motion by Appellant for a continuance at that time, the trial court raised the "specter" of a continuance based

upon the serious impact such an agreement would have on Appellant's defense.[1]

In fact, a plea agreement was reached late on Friday, June 7. The essence of the agreement was that the charges against Melton would be amended to conspiracy to commit first-degree assault and conspiracy to commit kidnapping, which are both punishable as "Class C" felonies. The penalty recommended by the Commonwealth would be ten years on each offense to be served consecutively. She and her family were also to receive adequate protection from the police. In exchange, she agreed to truthfully testify at Appellant's trial. Her sentencing was to be postponed for sixty days in order to allow for the trial of Appellant to be concluded.

The existence of the plea agreement was revealed on the morning of Monday, June 10, 1991, which had been scheduled to be the first day of trial. However, the Commonwealth was not initially prepared to disclose the substance of the plea agreement, the statement made by Melton in reaching the plea agreement, nor apparently any of the previous statements made by her. As a result, Appellant indicated he was not ready for trial, and a continuance was requested. The need for the continuance was based upon the failure to reveal the agreement and any of Melton's statements, as well as the need for additional investigation. Specifically, Appellant's counsel stated that he would now need to interview additional witnesses, whom he had not previously needed to consider in light of the severance of the trial of the co-defendants, and the anticipated order preventing any statements from them being introduced; carefully consider the insurance policy issued on the life of the decedent, which might have been a motive for Melton to kill, as had been suggested by one of the investigating detectives; and follow up on any new leads revealed in this new information, and information which was to be disclosed concerning payments made by the police to, or on behalf, of Moore. In view of the sudden and dramatic change in circumstances, the need for new investigation, and because the Appellant was on trial for a capital offense, a continuance for sixty days was requested. The Commonwealth took the position that no continuance was necessary because it would take a week to seat the jury, which would allow for any needed investigation. The decision on the motion was postponed until the afternoon when Melton's counsel would be available.

At 1:00 p.m., Melton's counsel disclosed the substance of the plea agreement, which was outlined above. The Commonwealth disclosed that there was no record of the statement made during the plea agreement by Melton either by the Commonwealth Attorney or by the investigating detective. Again, the Commonwealth was not prepared to release any statements made by Melton and proposed releasing them only on the morning of trial. After discussion between counsel and the trial court, which included a reiteration by Appellant's counsel of the grounds for continuance previously noted, as well as further explanation of the need for investigation based upon the vast difference between the statement Melton must have made during the plea agreement and her previous statements; the extensive file on Melton, who had been the subject of investigation, since the time of decedent's death; and the need to explore the psychiatric history of Melton, who had asked for a psychiatric examination shortly after her arrest. The trial court determined that a continuation of one week until Monday, June 17, 1991 was sufficient. It was further ordered that the Commonwealth would produce the statement made by Melton as a part of the plea agreement by noon on Wednesday, June 12, 1991, as well as any other statements made by Melton.

On Friday, June 14, 1991, Appellant renewed his motion for a continuance of sixty days. In support of the motion, counsel restated the previous grounds, and pointed out that new lines of investigation developed as a result of the disclosure of Melton's statements. Specifically, questions had been raised about previous fires in which Melton

---

1. The Commonwealth in its brief makes a pointed reference to this "failure," which seems overblown, at the least, since a motion for a continuance on June 7 would have been premature because there was no deal at that time.

had been involved and had collected insurance proceeds, which related to the allegation that Melton had killed to collect on decedent's life insurance policy, which would also provide a source of payment to Appellant and Perdue. Some investigation had been attempted on Thursday, June 13, 1991, which was the first day it could be attempted after delivery of Melton's statements on the afternoon of Wednesday, June 12, but was not completely successful, because one of the insurance agencies involved was closed. Additionally, there were statements made by Melton to neighbors; an attempt to intimidate one of the neighbors, Wanda Carter, by Melton's boyfriend, Chuck Connors; questions concerning the time and dates of Melton's employment at Lake Lure Lodge; and questions about Melton's alibi witness, all of which needed further investigation. Appellant's counsel pointed out that all the needed investigation had to be accomplished during the remainder of Friday, and over the weekend, since trial was scheduled for Monday, June 17. The Commonwealth took the position that under Appellant's theory one would never be ready to try the case since there would always be other lines of investigation. Apparently, the trial court was persuaded because the motion was overruled.

The case proceeded to trial on Monday, June 17. After final pre-trial motions were considered, voir dire was commenced. Voir dire was conducted through Wednesday, June 19, when it was completed. The Commonwealth presented its case on June 19; Thursday, June 20; Monday, June 24; and concluded on Tuesday, June 25, at which time Appellant presented his case. Instructions were argued on Wednesday, June 26. The guilt phase was concluded with instructions and closing arguments on Thursday, June 27, as was the penalty phase. Appellant was found guilty of murder and first-degree arson, and was sentenced to life without the possibility of parole for twenty-five years and life, respectively. Any additional facts necessary to our analysis will be set forth in the context of our discussion of the issues.

█ The first issue presented is whether the trial court abused its discretion in not granting Appellant's motion for a continuance of sixty days. A continuance will be granted upon a showing of sufficient cause. RCr 9.04; *Snodgrass v. Commonwealth*, Ky., 814 S.W.2d 579, 581 (1991). The decision as to whether to grant a continuance is within the sound discretion of the trial court based upon the unique facts and circumstances of the case. *Snodgrass*, 814 S.W.2d at 581. Factors that should be considered by the trial court include:

(1) The length of delay;

(2) Whether there have been any previous continuances;

(3) The inconvenience to the litigants, witnesses, counsel, and the court;

(4) Whether the delay is purposeful or caused by the accused;

(5) The availability of competent counsel, if at issue;

(6) The complexity of the case; and

(7) Whether denying the continuance would lead to any identifiable prejudice.

*Id.* We also note that Appellant's case was a capital case, with the death penalty possible, which makes the case qualitatively different. *See Smith v. Commonwealth*, Ky., 845 S.W.2d 534 (1993).

█ As an initial note, there can be no dispute but that the plea agreement reached with Melton was a surprise, and had a sudden and dramatic impact upon Appellant's defense. With that factor in mind, we will consider individually the factors noted in *Snodgrass*. The length of delay in this case was only sixty days, which is rather minimal, particularly in a death penalty case. Thus, the delay factor should not have seriously impacted the continuance decision.

Second, the continuance was the *first* sought by anyone, which distinguishes the result in *Snodgrass*, as well as most other death penalty cases, where numerous continuances are the rule rather than the exception. Nor are we persuaded by the Commonwealth's parade of horribles concerning the neverending need for further investigation since this was the first continuance sought, and any such problem can be properly considered when, and if, additional continuances are sought. Consequently, the previ-

ous-continuances factor should not have come into play in the decision on Appellant's motion for continuance.

The third factor is the inconvenience caused by the continuance. Of course, any change in trial date is going to cause some inconvenience. Thus, in order to become a factor for consideration there must be some significant or substantial inconvenience, which should be demonstrated on the record. We note that in this case a continuance was granted, albeit only one week, which strongly suggests that the trial court was willing to put everyone to some inconvenience. As a result, it is difficult to see how a slightly longer period would have any significantly greater impact. While the reissuance of subpoenas could be an inconvenience, we note that the trial court has the power to put witnesses on recognizance to return on the newly scheduled trial date. In light of all the above, we must conclude that the inconvenience factor does not weigh seriously against granting Appellant's motion for continuance in this instance.

There is no evidence in the record that the delay sought by Appellant was caused by him, or made for the purpose of delay in and of itself. In fact, the cause of the delay was the timing of the plea agreement with Melton. While it is not appropriate on this record to "blame" the Commonwealth, since there is no evidence as to why the deal with Melton was not made at an earlier time, it is fair to note that the Commonwealth is the one with the most control over such situations, and if it delays making a deal until the eve of trial, it runs the substantial risk that a continuance will be granted. Therefore, the cause of the delay factor cannot be held against Appellant, and may weigh in his favor.

The fifth factor[2] concerns the complexity of the case. This case was a death penalty case, which factor alone makes it more complex. Additionally, the charges were initially based upon the statements made by an informant, with numerous potential reliability problems, based upon statements allegedly made to her by Appellant and Perdue. Thus, numerous, and often difficult, hearsay and confrontation questions are presented. The complications are heightened, rather than lessened, by the last-minute introduction of a confessing co-defendant. As a result, the complexity factor should have weighed in favor of the continuance.

Finally, the last factor is whether there is identifiable prejudice caused by the denial of the motion. In this instance, there is no question that Appellant's investigation was cut short. As we will note more fully later in the opinion, the avenues of investigation being pursued yielded relevant evidence, and might well have yielded additional, but as yet, undiscovered evidence if a full investigation had been possible. As such, there was clearly identifiable prejudice. It is no answer, as the Commonwealth attempts, to say that Appellant's counsel skillfully used the short time he had, and presented the best defense he could, since the question cannot be limited to what the defense is able to do despite the denial of its continuance motion, but whether legitimate, substantial avenues of investigation were prematurely cut off. In short, as Appellant argues in his brief, a defendant cannot be made subject to the "Catch 22" argument that he got enough investigation in the time available to obviate the need for a continuance, since such an argument begs the question of whether a continuance was actually appropriate. In sum, there was identifiable prejudice which is not eliminated by the skill of Appellant's trial counsel.

Based upon our analysis of the relevant factors from *Snodgrass*, we conclude that the trial court abused its discretion in denying the motion for a sixty-day continuance. We particularly note the complexity of the case, the prejudice identified, and that the other factors should have had little, if any, impact on the continuance decision. As a result, we must reverse the conviction of Appellant and remand for a new trial after an appropriate period is allowed for further investigation by Appellant.

---

**2.** There is no issue in this case concerning Appellant's counsel, or any potential substitute counsel, as would arise if there was an attempt to withdraw by counsel on the eve of trial as a result of a breakdown of communications between counsel and client.

Appellant's second argument concerns his right to discover the medical and psychiatric records of Melton and Moore. This is an area where legitimate, substantial avenues of investigation were prematurely cut off. At issue regarding Melton are records that may have been generated as a result of her request for psychotherapy shortly after her arrest in 1990, as well as other similar medical records, which would include her treatment from a Dr. Blose for emotional problems and "probably" depression. Additionally, her testimony disclosed that she was hospitalized for reasons unknown immediately after decedent's murder. Finally, she testified on avowal that she suffered from total amnesia from some time in the past, but could not remember the exact date. Moore's problems included admitted drug addiction, which along with her epilepsy and severe depression formed the basis for a social security disability claim. The epilepsy had been treated since her childhood with Dilantin. Apparently, she was under the care of a Dr. Bloce[3] and a Dr. Garcia in reference to seizures resulting from her epilepsy. She had been hospitalized in Florence, Kentucky, in January 1989, and in Texas in June 1990. The Texas hospitalization also seems to be related to her seizures. She had attempted suicide in June 1990.

There does not appear to be any real dispute that Appellant is entitled to discover medical or psychiatric records concerning a witness if certain prerequisites are met. The fight is over what showing is required to gain such access. An important subsidiary question concerns how far the Commonwealth must go in furnishing such records, particularly where it does not have immediate, physical possession of them.

The Commonwealth relies primarily upon *Commonwealth v. Huber*, Ky., 711 S.W.2d

490 (1986), for its argument on the merits that there was no error in denying Appellant's discovery requests. It holds that the prior mental treatment of a witness is relevant regarding the witness's credibility only where it can be shown that the witness suffered from a "mental deficiency," either at the time testimony was given or at the time at which the matter testified about occurred, and if the psychiatric problems relate to credibility. *Id.* at 491.

However, that holding is not as broad as the Commonwealth suggests. *Huber* involved a question of whether a trial court had abused its discretion by restricting a defendant's cross-examination at trial of the prosecution's key witness when the defendant had no substantial basis for the questions sought to be asked. In this case, the issue is actually one preliminary to that in *Huber*. Thus, *Huber* is not controlling.

■ It is clear that the government must produce evidence that is favorable to the accused and material to the question of his guilt and punishment. *Pennsylvania v. Ritchie*, 480 U.S. 39, 55–56, 107 S.Ct. 989, 1000, 94 L.Ed.2d 40, 57 (1987). Information that is thus disclosable will not necessarily be withheld because it is embarrassing to a witness for the prosecution. *Id.*, 480 U.S. at 58–59, 107 S.Ct. at 1001–02, 94 L.Ed.2d at 58; *Davis v. Alaska*, 415 U.S. 308, 320–21, 94 S.Ct. 1105, 1112–13, 39 L.Ed.2d 347, 356 (1974); *see also Turner v. Commonwealth*, Ky., 767 S.W.2d 557, 559 (1988), which held that the complaining witness can be compelled to submit to a medical examination where the critical nature of the evidence sought by the defendant outweighs the potential for harm caused by the resulting invasion of the victim's privacy, and the probability that the examination sought was intended to harass the witness.[4] Information regard-

---

3. It is not clear from the record whether Drs. Bloce and Blose are one in the same person, or different physicians.

4. The source of this right is subject to some debate. It has been argued that a defendant's right to compulsory process to secure his witnesses for trial is broad enough to impact upon the government's obligation to provide discovery, although the question has been deliberately avoided. *See* Sixth and Fourteenth Amendments

of the U.S. Constitution; Kentucky Constitution § 11; *Ritchie*, 480 U.S. at 55–57, 107 S.Ct. at 1000–01, 94 L.Ed.2d at 56–57.

It has also been debated as to whether the right to cross-examination, included within the confrontation clause of the Sixth and Fourteenth Amendments and § 11, has an impact on questions of discovery. *See Ritchie*, 480 U.S. at 52–53, 107 S.Ct. at 998–99, 94 L.Ed.2d at 54 (Powell, J., writing for the Court, but with only Rehn-

ing the credibility of a prosecution witness has been recognized as the sort of exculpatory evidence which is subject to disclosure. *Ritchie,* 480 U.S. at 56–57, 107 S.Ct. at 1000–01, 94 L.Ed.2d at 57 *et seq.; Rolli v. Commonwealth,* Ky.App., 678 S.W.2d 800, 802 (1984).

■ Before proceeding to analyze the specific procedure for such discovery, we must address the subsidiary question of the Commonwealth's obligation when the records sought are not in its immediate, physical control. The Commonwealth's obligation includes records actually in the hands of the prosecutor, its investigator, and other agencies of the state. *Ritchie,* 480 U.S. at 58–59, 107 S.Ct. at 1001–02, 94 L.Ed.2d at 58; and *Ballard v. Commonwealth,* Ky., 743 S.W.2d 21, 22–23 (1988), which reversed a conviction after the Department for Human Resources withheld exculpatory evidence ordered to be produced, of which the Commonwealth's investigator was aware, although the Commonwealth's Attorney was not.

■ The Appellant's argument requires us to take the analysis as to both what is discoverable, and the Commonwealth's obligation to produce it one step further. Specifically, Appellant seeks access to the medical records of witnesses which may not be in the hands of any government agent.[5] On this issue, we look to *Illinois v. Dace,* 114 Ill.App.3d 908, 70 Ill.Dec. 684, 449 N.E.2d 1031 (1983) for guidance.[6] There, it was held if a trial court is "[confronted] with articulable evidence that raises a reasonable inquiry of a witness's mental health history, [the] court should permit a defendant to discover that history." *Id.* 70 Ill.Dec. at 688, 449 N.E.2d at 1035. Moreover, the articulable

evidence required of the defendant does not have to establish the relevance and materiality of the records sought, which would be impossible without access to the records. *Id.* If necessary, the trial court should subpoena the records sought. *Id.* 70 Ill.Dec. at 687, 449 N.E.2d at 1034. However, the defendant is not entitled to unlimited access or use of the evidence sought. Instead, where the doctor or the patient raises the physician-patient privilege, or some other similar privacy interest is raised, an in-camera hearing shall be conducted by the trial court in the presence of the prosecutor and defense counsel to determine which information would be both relevant and material to the witness's credibility. *Id.* 70 Ill.Dec. at 688, 449 N.E.2d at 1035; *see also Davis,* 415 U.S. at 320–21, 94 S.Ct. at 1112–13, 39 L.Ed.2d at 356; *Ritchie,* 480 U.S. at 58–59, 107 S.Ct. at 1001–02, 94 L.Ed.2d at 58. A denial of effective cross-examination is a constitutional error of the first magnitude, and no showing of want of prejudice will cure it. *Davis,* 415 U.S. at 318–19, 94 S.Ct. at 1111–12, 39 L.Ed.2d at 355.

■ As to the specifics of this case, we conclude that the trial court abused its discretion in denying the discovery sought. When considered together, the numerous problems that Moore had accumulate into articulable evidence that raises a reasonable inquiry about Moore's past medical and psychiatric history sufficient to support Appellant's discovery request. Therefore, reversal is required. Upon remand, the trial court should direct subpoenas appropriately, and conduct any in-camera review necessary.

Regarding Melton, she made her mental state an issue by requesting psychiatric coun-

quist, C.J., and O'Connor and White, JJ., concurring), in which the answer was no; *Ritchie,* 480 U.S. at 61–64, 107 S.Ct. at 1003–05, 94 L.Ed.2d at 60–61 (Blackmun, J., concurring in part, and judgment, but writing separately on the issue), in which the answer was yes; and *Ritchie,* 480 U.S. at 65–67, 107 S.Ct. at 1005–07, 94 L.Ed.2d at 63 *et seq.* (Brennan, J., dissenting, joined by Marshall, J.), in which the answer was also yes.

The actual constitutional source relied upon in the opinion for the Court in *Ritchie* was the due process clause of the Fourteenth Amendment to the U.S. Constitution. *See Turner,* 767 S.W.2d at 559, which was also decided on the basis of due process, although there was no delineation of

whether the decision was based upon federal or state law.

5. It is not clear on the record whether some of the medical records sought regarding Melton's examination after she was incarcerated are in the hands of some government agency. The other records appear to be in the hands of private physicians.

6. *Dace* is based upon both the Sixth Amendment's right of confrontation and the Fourteenth Amendment's due process component. *Dace,* 70 Ill.Dec. at 688, 449 N.E.2d at 1035.

seling. As such, Appellant has met his burden to support his discovery requests. Reversal follows, and the trial court should proceed accordingly upon remand.

Even if Melton's mental state was not such as to support discovery initially, upon the discovery of her "amnesia" an adequate basis for discovery of her medical and psychiatric records was created. *See Ritchie*, 480 U.S. at 59–60, 107 S.Ct. at 1002–03, 94 L.Ed.2d at 59, which noted that the duty to disclose is ongoing, and that material originally deemed immaterial may become material as proceedings progress, and a trial court would be obligated to order release of information that had become material.

Appellant also argues that the trial court should have held a competency hearing as to both Melton and Moore. *See* KRS 421.200, repealed Ky. Acts 1992, Ch. 324 § 33, *see* KRE 601. However, we need not decide the issue in view of our decision to reverse on other grounds, and remand for additional discovery. If upon remand sufficient additional evidence is adduced bearing upon the competency question, the trial court should reconsider the issue.

 The third argument is that numerous instances of evidence of other bad acts were improperly used against Appellant. The question presented is whether the evidence should have been admitted in light of the general rule proscribing the admission of evidence of other, uncharged crimes or bad acts. *See Billings v. Commonwealth*, Ky., 843 S.W.2d 890, 892 (1992). Such evidence is admissible only if probative of an issue independent of character or criminal predisposition, and only where the probative value of, and need for, the evidence outweighs its unduly prejudicial effect. *Id.; Sanders v. Commonwealth*, Ky., 801 S.W.2d 665, 674 (1990). The traditional exceptions to the rule are where the evidence establishes motive, intent, guilty knowledge, identity, common plan or scheme, or absence of mistake or accident. *Billings*, 843 S.W.2d at 892. It has been said that the exceptions can be distilled down to the basic question of whether the evidence is relevant regarding one or more of the fundamental elements of a crime: *corpus delicti*, identity, or *mens rea. Id.*

 The first, and most glaring, misuse of other crimes evidence occurred during the testimony of Moore. She was allowed, despite a pre-trial motion in *limine*, to testify "[Appellant] said because if you're going to commit murder do it in Russell County because you will get away with it." The statement is said to be an admission of guilt. However, the statement does not contain a confession per se. Only by reading between the lines could it be said to be any confession. Instead, the statement appears to be more prospective—"if you're going to"; therefore, more logically, it is a statement relating to future "acts" or intent. As a result, it is not relevant to the charges at issue, and it relates only to criminal character or predisposition, which precludes its admission. *Id.* Even if one were to assume the statement was a confession, when one considers the prejudicial impact against the probative worth of the statement, which is limited by its prospective language, and the need for the statement, which is limited given the other instances in Moore's testimony where she testified in a much less inflammatory manner to instances in which Appellant "confessed," the statement still must be excluded. *Id.* Consequently, we must conclude that the trial court abused its discretion in admitting the statement. Since we are reversing on other grounds, we need not expressly decide if this error alone would amount to reversible error, although we do note the significant prejudicial impact the admission of this statement has on Appellant's defense.

 A similar question was also subsequently asked of Moore by the Commonwealth. Although the issue is not preserved by contemporaneous objection, we will address it because it may arise on retrial. Specifically, the following exchange occurred between Moore and the Commonwealth's Attorney:

Q. Cynthia Moore, look at the Jury and tell them if you knew about any other murders that might have occurred in this section of the state, during the time you lived with Frank Eldred?

A. I have heard him talk about them, but I don't know any names, or anything like that, but yes.

Q. Were you acquainted with any other case, or any other murder down here besides the one you've testified about?

A. No.

This exchange is subject to the same analysis as the statement about committing murder in Russell County. The only reason it is addressed separately is because it shows a clear misunderstanding of the law concerning admission of other crimes evidence. The general rule is that such evidence is not admissible. *Only* where the evidence fits within one of the exceptions to the rule can it be considered for admission; it will be admitted only after a weighing process demonstrates the need for the evidence and the probative force of the evidence outweighs its admitted unduly prejudicial impact. This exchange does not even come close. Its admission was error.

The next issues on this subject we will consider generically. On several occasions Appellant was referred to as a biker, a drug dealer, a pimp, and as having made threats against Melton or Moore. Some of these instances are not preserved, but we will address them since they may arise upon retrial. As a general principle, the fact Appellant may have been a biker, a drug dealer, or a pimp has no relevance to this case, and it is difficult to find an exception under which such references could be admitted. They do not show Appellant's motive, intent, or guilty knowledge. Nor does identity appear to be an issue, which is one ground the Commonwealth advances on appeal for the admission of the biker references; thus, the evidence is not admissible under this exception. Finally, they do not relate to common plan or scheme, or absence of mistake or accident. Consequently, this type of evidence would appear to not be proper. However, it is difficult to judge these questions in the abstract, and the trial court should consider any such evidence when the issue is presented consistent with this opinion.

As for the evidence of "threats," including generic statements made by the witnesses of their fear of Appellant, it is subject to a similar analysis. However, testimony as to actual threats made, as opposed to the more non-specific "fear" testimony, which appears more related to Appellant's character, may be admissible if it relates to the charges at issue in this case.

Finally, we note that the Commonwealth on appeal relies upon the "unsolicited" nature of the statements on several occasions in defending their admission. The "unsolicited" factor only bears upon a harmless error analysis, and cannot in any way justify the admission of other crimes evidence. Moreover, when the "unsolicited" defense appears enough times, an inference may be raised that either the witness or the Commonwealth is out of control, and is trying to abuse the system. While such is not necessarily established on this record, instances of such abuse coupled with other areas of prosecutorial misconduct do raise the specter of reversible error, in and of themselves. *See Sanborn v. Commonwealth,* Ky., 754 S.W.2d 534 (1988).

Complaint is also made as to the introduction of certain photographs. Specifically, Appellant asserts that two photos of the interior of the victim's car after it was destroyed by the fire, which also indistinctly show the remains of the decedent, were irrelevant and inflammatory, and a proper foundation was not laid. We first note that the detective specifically testified as to each of the photos that they truly and accurately depicted the scene when the automobile was discovered, which supplies the necessary foundation. As for the other questions, the general rule is that relevant pictures are not inadmissible just because they are gruesome and the crime they depict is heinous. *Clark v. Commonwealth,* Ky., 833 S.W.2d 793, 794–95 (1992). The Commonwealth is allowed to depict the actual crime scene, which is what the photos at issue do. *See Id.* While the photos are not the most distinct, they are not so indecipherable as to lose all relevance. Nor does the brutality of the crime they depict render them inadmissible. *Cf. Id.* Thus, there was no error in their admission.

Appellant also argues that a photo of the decedent taken a few months before his death was prejudicial since it unduly engendered sympathy for him. There is no error in presenting evidence of a victim as a living

person, as opposed to a mere statistic, provided the evidence is not shocking, sensational, likely to provoke anger, or likely to induce undue sympathy or hostility. *McQueen v. Commonwealth,* Ky., 669 S.W.2d 519, 523 (1984). The photo in this case is a rather innocuous 8–by 11–inch portrait of the victim. It does not violate the rule from *McQueen;* therefore, there was no error in its admission.

 The next error asserted concerns the admission of evidence seized and a statement made by Appellant during the course of his warrantless arrest on November 15, 1990. A police officer may make a warrantless arrest when the officer has reasonable grounds to believe a felony has been committed, and that the arrested individual committed the felony. *Crawford v. Commonwealth,* Ky., 824 S.W.2d 847, 849 (1992). In other words, was there probable cause to make the arrest, which must exist and be known to the officer at the time of the arrest. *See Clark v. Commonwealth,* Ky.App., 868 S.W.2d 101, 106 (1993). Probable cause cannot be found in retrospect. *Id.* Probable cause exists when the totality of the evidence, which includes the reliability of an informant and her basis of knowledge, then known to the arresting officer creates a fair probability that the arrested person committed the felony. *See Beemer v. Commonwealth,* Ky., 665 S.W.2d 912, 913–15 (1984); *Id.* at 106–07.

 In this case, the evidence available to the arresting officer was based primarily upon the statements of Moore concerning Appellant's "confession" to her. Additionally, there was some corroboration of some of the details of her statement from evidence independently developed during the course of the investigation. However, it is equally true that some of the details from Moore were not corroborated by the investigation, and some were contradicted by the investigation. Moreover, there are substantial problems with Moore's reliability, which were noted in reference to the second argument presented by Appellant. Nonetheless, we must conclude from the totality of the evidence that the arresting officer had reasonable grounds to arrest Appellant for the murder of decedent. Consequently, the evidence seized

from, and the statements made by, Appellant were properly introduced.

Appellant's sixth assignment of error concerns the exclusion of certain evidence he desired to present to the jury. The first evidentiary ruling challenged concerns the admission of statements by a neighbor of Melton, Wanda Carter, that Melton's boyfriend, Chuck Connors, offered Carter money to leave the state. He also threatened her in an effort to deter her from testifying that Melton had come to Carter and asked if she knew of anyone who would kill the decedent. The statements from Carter, and a denial that they were made by Connors, as well as the relationship between Connors and Melton, were made by avowal. This is another avenue of investigation which yielded relevant evidence, but which may have been prematurely cut short.

 The basic issue is whether the evidence relates to a "collateral" matter. Impeachment by contradiction regarding collateral facts is prohibited. Lawson, *The Kentucky Evidence Law Handbook* (3d Ed.1993) § 4.10. However, the intimidation of a witness by a defendant, or by her agent in this case, is admissible on the issue of guilt. *Collier v. Commonwealth,* Ky., 339 S.W.2d 167, 168 (1960). Moreover, Appellant has the right to introduce evidence that another person committed the offense with which he is charged, which would include the intimidation of Carter by Connors since it is evidence of Melton's guilt in the murder of the decedent. *Kelly v. Commonwealth,* 259 Ky. 770, 773, 83 S.W.2d 489 (1935). As a result, the evidence offered concerning the intimidation of Carter was not collateral and should have been admitted. Since we are reversing on other grounds, we need not decide if this error alone would necessitate a reversal, although it is another example of the trial court's erroneous ruling denying Appellant the opportunity to present his defense. Upon retrial, if such evidence is offered it should be admitted.

 The second evidentiary ruling with which Appellant takes issue is the exclusion of evidence that Melton lied on certain insurance forms. Specifically, evidence was of-

fered by avowal that indicated that on an application for fire insurance for Melton's home that she had failed to advise the insurance company of other similar fire losses within three years of the application. As a result of that omission, her claim under the policy was initially denied, although ultimately she obtained a settlement. The evidence was said to be offered as impacting Melton's credibility since she had lied on the applications, as showing a pattern of conduct, and as reflecting on her motivation to kill the decedent.

The problem we have with this evidence is that it has wandered off into that nebulous realm of "collateral facts." *See* Lawson, § 4.10. While any lie by Melton does reflect on the likelihood she is telling the truth at trial, the "lies" on the insurance application are sufficiently remote from the real issues at trial to support the trial court's decision to exclude them. *Id.* Additionally, there is no true common plan or scheme between arson for profit and arson for murder under *Billings, supra.* Finally, as to motive, the evidence was at best cumulative, which would indicate its improper exclusion could not be reversible error. As a result, we conclude that the trial court did not err in excluding the evidence regarding Melton's insurance application.

The seventh error argued is that Appellant's conviction of both murder and arson is a violation of double jeopardy. Specifically, it is argued that the two charges arose from the same course of conduct, which precludes conviction on both charges. *See Grady v. Corbin,* 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990).

The starting point for analysis of Appellant's double jeopardy claim must be *Ingram v. Commonwealth,* Ky., 801 S.W.2d 321 (1990).[7] The double jeopardy provision of Section Thirteen of the Kentucky Constitution provides that "[n]o person shall, for the same offense, be twice put in jeopardy of his life or limb...." It bars subsequent prosecution for an offense once a defendant is acquitted or convicted, and it also prohibits multiple punishment for the same offence. *Ingram,* 801 S.W.2d at 322.

The constitutional proscription against double jeopardy in Kentucky begins with consideration of the venerable precedent of *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). The test derived therefrom is that where an act or transaction constitutes a violation of two distinct statutes, a defendant can be prosecuted for both if each statute requires proof of a fact the other does not.[8] *Ingram,* 801 S.W.2d at 322, quoting *Blockburger,* 284 U.S. at 304, 52 S.Ct. at 182. In other words, is one offense included within another. *Ingram,* 801 S.W.2d at 322.

The next step in the consideration of a double jeopardy challenge is the second prong enunciated in *Ingram.* It prohibits multiple prosecutions where the offense(s) arose from a single act or impulse with no compound consequences, even though "[b]y virtue of additional, circumstantial facts, the behavior was offensive to two criminal statutes." *Id.* at 324–25.[9]

Under the *Blockburger* prong of *Ingram,* we readily conclude that there was no double jeopardy violation occasioned by the conviction of Appellant for murder and arson. The murder charge requires proof of dece-

7. We are, of course, aware of the statutory scheme in KRS 505.020 *et seq.*, which establishes a method of analyzing double jeopardy challenges for multiple offenses (KRS 505.020); former prosecutions for the same offense (KRS 505.030); former prosecutions for different offenses (KRS 505.040); and former prosecutions in other jurisdictions (KRS 505.050). However, in view of the plain language in *Ingram,* which held that "[t]his Court holds the Kentucky Constitution superordinate to legislative intent," *Ingram* is the proper source for double jeopardy analysis. *Ingram,* 801 S.W.2d at 323.

8. The provisions of KRS 505.020–.050 appear to be an attempt to codify *Blockburger. Ingram,* 801 S.W.2d at 322.

9. We note that the issue is not *Grady,* 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548, which was recently overruled in *United States v. Dixon,* 509 U.S. ——, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993). Although this Court in *Ingram* quoted the "same conduct" test enunciated in *Grady,* it did not adopt it. *Ingram,* 801 S.W.2d at 323. Moreover, the "single act or impulse" test of *Ingram* would appear to be narrower than the same conduct test.

dent's death, which is not required in proving arson. On the other hand, arson requires only proof of serious physical injury. Additionally, the arson charge requires proof of intent to damage or destroy the automobile, which is not an issue in the murder charge. Thus, there are distinct elements in each of the offenses not required for the other, which precludes a finding of double jeopardy under the first prong of *Ingram*.

■ Neither does the second prong in *Ingram* preclude appellant's conviction for both murder and arson. While double jeopardy principles prohibit multiple prosecutions for crimes which arise from only a single act or impulse, an exception is made when that act produces compound consequences. The results achieved by appellant's criminal conduct produced compound consequences arising from his single act of burning the automobile with the victim inside. Setting the car afire had the compound consequences of killing the occupant and destroying the car, the former being murder and the latter being arson. The conviction of appellant for both crimes was proper.

■ The next argument concerns the Commonwealth's closing argument in the guilt phase. Although it will belabor an already overlong opinion, we will quote at length from the offending portions of the closing argument.

Herbert Cannon has been dead for over 1,000 days and nights. The Defendant, and indeed you and I, and all of us in this courtroom, have had those days and nights. I'm sure Herbert would have liked to have had those days and nights. If, in the future, one should say a prayer, say one for Herbert. If, in the future, one should light a candle, light one for Herbert. If, in the future, someone should cry a tear, cry one for Herbert. I ask nothing for my ownself. I ask nothing for the State Police. I ask nothing in the name of persecution. I ask nothing that is wrong. But, not—I ask for everything in the name of what is right, and in the name of what is just. That's why we're here. We ask for everything in the name of truth. In the third chapter of Ecclesiastes it says, "There is a time for everything under the heavens, a time to be born, and a time to die." Surely God did not intend on the 23rd day of July, 1988, that Herbert Cannon dies. Surely the cold, callous words of the Defendant as to why the killing took place in Russell County, to the effect that you can get away with murder in Russell County, is not true. Say a thousand times if it takes it that you cannot get away with murder in Russell County. Return a verdict of guilty. Herbert Cannon cries from the grave for what is just and right. From his poor, dismantled, and burned body, he asks, through me, return a verdict of guilty.

Specifically, error is asserted concerning the prosecutor's quotation from Ecclesiastes, and then arguing that the decedent had been killed before God intended him to be. Appellant suggests that this argument is essentially the same as the argument that was condemned in *Ice v. Commonwealth,* Ky., 667 S.W.2d 671, 676 (1984). Disregarding the distinction that the argument in *Ice* was made during the penalty phase while the argument in this case was made in the guilt phase, which is a distinction without any real difference, the situation is distinguishable. In this instance, the argument was not made, as it was in *Ice,* that *The Bible* or God required a conviction. Instead the reference was more in the way of a literary reference. In that vein, we note for what it is worth that the same quotation could have been made from several other sources which quote *The Bible,* including Shakespeare, Dickens, the musical "Hair," and The Byrds' song "Turn, Turn, Turn," although perhaps not with the same persuasiveness. Thus, we find no reversible error. However, we do note the prejudicial impact under this argument of the erroneous admission of Appellant's Russell County comment analyzed above.

■ Further attack is made upon the closing argument asserting that the prosecutor improperly attempted to elicit sympathy for the decedent. Although the question presented is not without its difficulties, considering the leeway a prosecutor is allowed in *arguing* his case, we cannot say the attempt to elicit sympathy rose to the level of revers-

ible error. *See Smith v. Commonwealth,* Ky., 734 S.W.2d 437, 448, 452 (1987).

However, we do think it appropriate to further note that prosecutors have "the responsibility to [prosecute] according to the principle that one accused of a crime is entitled to a fair and impartial trial." *Clark,* 833 S.W.2d at 797. That responsibility is abused when they make arguments that appear calculated to skate as close as possible to the edge of arguments previously condemned by this Court. Such gamesmanship does not do justice, and always flirts with a fall through thin ice into the icy waters of reversal for prosecutorial misconduct. Both portions of the argument at issue in this case appear to have been based upon such a calculation. However, in this instance we need only condemn the arguments and warn against repeated reliance upon them, or any similarly calculated argument.

■ It is also argued that Appellant was entitled to a directed verdict on the issue of the aggravating factor of "murder for hire." It is said that the only evidence on the subject is the uncorroborated testimony of Moore, who is completely unreliable. The standard for a directed verdict is as follows:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

*Commonwealth v. Benham,* Ky., 816 S.W.2d 186, 187 (1991). An appellate court reviewing the issue must determine whether it would have been clearly unreasonable for a jury to find a defendant guilty, and otherwise uphold the jury's verdict. *Id.* While there may be a case where a witness's testimony is so incredulous, self-contradictory, or otherwise unreliable that the testimony could not support a conviction, Moore's testimony is not so deficient. It was up to the jury to

determine how "unreliable" her testimony was. We further note that Melton testified that she had hired Appellant to murder the decedent. Therefore, it was not clearly unreasonable for the jury to find Appellant guilty. As a result, there was no error in overruling Appellant's motion for a directed verdict.

■ The last separate argument was raised by way of a supplemental brief. It is based upon the conduct of an Assistant Commonwealth's Attorney during Appellant's closing argument. Specifically, as stated by the trial court:

> I want to state for the record that at least 3 or 4 times during the Closing Argument of [Appellant's trial counsel] the attention of myself, the Court, was drawn to the table in which the Commonwealth Attorneys were seated by noise. And that noise was made by the Assistant Commonwealth Attorney.... Upon observing the Commonwealth table I personally observed [him] smiling, and making expressions of what I would interpret to be disbelief directed toward [his colleagues]. The importance of this is, the Jury in this courtroom in Russell County is seated in such a way so as to directly face the prosecutor's table. I didn't stop [Appellant's trial counsel's] closing statement, but I don't want that kind of thing to go on. It shouldn't have happened. The proceeding should not be affected by jestures [sic]. And it's common rules of courtesy to the Court, and opposing counsel, and to the Jury as well as the integrity of the proceedings, demand a higher level of conduct, and I don't appreciate it.

The following motion for a mistrial was overruled. We also note the offending party's childish "he did it too" comment. Although we find no reversible error, our comments following our discussion of the Commonwealth's closing argument are applicable here too. In fact, such conduct unremoved from the heat of closing argument is even more condemnable; it cannot be tolerated.

Appellant's cumulative error argument is rendered moot by our decision to reverse and remand.

For the reasons set forth above, we reverse the convictions of Appellant for murder and arson and remand for further proceedings consistent with this opinion.

STEPHENS, C.J., and LEIBSON, and REYNOLDS, JJ., concur.

STUMBO, J., concurs in part, but dissents by separate opinion in regard to the double jeopardy issue.

WINTERSHEIMER, J., dissents and files a separate opinion herewith, in which FUQUA, J., joins.

LAMBERT, J., concurs in the majority opinion's treatment of the double jeopardy issue, and dissents without separate opinion as to reversal of the conviction.

STUMBO, Justice, concurring in part and dissenting in part.

Respectfully, I must dissent from the majority's conclusion that the conviction of Appellant for both murder and arson was proper pursuant to the second prong in *Ingram v. Commonwealth*, Ky., 801 S.W.2d 321 (1990).

The second prong in *Ingram* yields a different result than expressed by the majority. In this case, the act of burning the car (i.e., arson) is part and parcel of the murder, which was the intended result. In other words, the arson was but the instrumentality to accomplish the murder. As such, it is the product of the same act or impulse. Nor is this a case where there are "compound consequences." Although the phrase "compound consequences" is laden with considerable ambiguity, the typical application would be where someone fired an automatic weapon into a crowd intending to kill only one person, but ended up killing several people. In that instance, the killer could properly be charged with multiple murders, even though they were the product of only "one act or impulse." By contrast, in this case the result of burning the car was to kill the decedent; there were no additional consequences or repercussions as a result of the burning of the car itself. Therefore, the conviction of Appellant for both murder and arson in this case was a violation of the proscription against double jeopardy in Section Thirteen of the Kentucky Constitution.

With all other issues, I concur.

WINTERSHEIMER, Justice, dissenting.

I respectfully dissent from the majority opinion because none of the alleged errors cited are of sufficient importance to require reversal.

Eldred failed to demonstrate that the trial judge abused his sound discretion when he refused to continue the trial for an additional sixty days. The trial judge did postpone the trial for one week to permit any additional investigation by defense counsel. Eldred has failed to show how the refusal of the trial judge to further delay the trial prejudiced the defendant's ability to defend himself against the charges. Whether a continuance is appropriate in a particular case depends upon the unique facts and circumstances of that case, and the decision to delay a trial rests solely within the sound discretion of the trial judge. RCr 9.04; *Snodgrass v. Commonwealth*, Ky., 814 S.W.2d 579 (1991). The detailed review of the decision of the trial judge in this regard made by the majority opinion does not convince me that there is any error such as would be condemned by *Snodgrass, supra.* A review of the record indicates that the trial judge exercised his discretion properly in determining whether to allow a delay and considered the length of the delay, previous continuances, inconvenience to litigants and the court, whether the delay is purposeful or caused by the accused, the complexity of the case and whether denying the continuance would lead to identifiable prejudice. There is no basis to reverse the conviction in this case.

The trial judge properly excluded evidence of the general mental condition of Moore and Melton because there was no demonstration by the defendant that any psychiatric problems could be related to their credibility. I do not believe that any avenue of investigation was prematurely terminated by the trial judge.

*Commonwealth v. Huber*, Ky., 711 S.W.2d 490 (1986), states in pertinent part as follows:

> The prior mental treatment of a witness is not relevant as to the credibility of that witness unless it can be demonstrated that there was a mental deficiency on the part of the witness, either at the time of the testimony or at the time of the matter being testified about. The mere fact that a particular witness has been treated for any kind of psychiatric problem in the past is of no significance in the impeachment of that witness unless it can be shown that the psychiatric problems relate in some way to the credibility of the witness.

The standard of *Huber, supra,* was not satisfied in regard to the general mental condition of either of the two witnesses. Thus the evidence was properly excluded. *Cf. Stanford v. Commonwealth*, Ky., 793 S.W.2d 112 (1990). The trial judge did not abuse his discretion in denying the discovery sought.

Eldred has failed to demonstrate that there was any improper introduction into evidence of prior bad acts or character evidence which would require a reversal. None of the complained of statements during the trial deprived Eldred of a fundamentally fair trial. The statements which are alleged as error are either unpreserved, were relevant for the jury to hear or were otherwise introduced into the proceedings as a result of the trial strategy of the defendant.

I agree with the majority that there is no double jeopardy in this case because murder and first-degree arson require proof of an element the other does not. However, the double jeopardy analysis in *Ingram v. Commonwealth*, Ky., 801 S.W.2d 321 (1990), is still fatally flawed because it relies on *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), which has been subsequently overruled in *United States v. Dixon*, 509 U.S. ——, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993). This has been duly noted by the majority opinion. It is time to put *Ingram* to rest by overruling it. The same fate should fall to *Walden v. Commonwealth*, Ky., 805 S.W.2d 102 (1991). I believe Kentucky should return to the reasoning of *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932) and the standard set out in *Wilson v. Commonwealth*, Ky., 695 S.W.2d 854 (1985) and *Polk v. Commonwealth*, Ky., 679 S.W.2d 231 (1984). See my dissent in *Ingram*.

I would affirm the conviction in all respects.

FUQUA, J., joins in this dissent.