Gerald YOUNG, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee,

and

Erskin F. Thomas, Appellant,

v.

Commonwealth of Kentucky, Appellee,

and

Darrell C. Morbley, Appellant,

v.

Commonwealth of Kentucky, Appellee.

Nos. 1998–SC–0584–MR, 1998–SC–0607–MR and 1998–SC–0963–TG.

Supreme Court of Kentucky.

April 26, 2001.

Rehearing Denied Aug. 23, 2001.

Donna L. Boyce, Appellate Branch Manager, Department of Public Advocacy, Frankfort, KY, Richard Hoffman, Assistant Public Advocate, Department of Public Advocacy, Frankfort, for appellant Gerald Young (1998–SC–0584–MR).

A.B. Chandler, III, Attorney General, Frankfort, KY, Kent T. Young, William L. Daniel, II, Assistant Attorneys General, Office of Attorney General, Criminal Appellate Division, Frankfort, for appellee Commonwealth of Kentucky (1998–SC–0584–MR).

Elizabeth Shaw, Richmond, for appellant Erskin F. Thomas (1998–SC–0607–MR).

A.B. Chandler, III, Attorney General, Frankfort, KY, Kent T. Young, William L. Daniel, II, Assistant Attorneys General, Office of Attorney General, Criminal Appellate Division, Frankfort, for appellee Commonwealth of Kentucky (1998–SC–0607–MR).

V. Gene Lewter, Fayette County Legal Aid, Inc., Lexington, for appellant Darrell C. Morbley (1998–SC–0963–TG).

A.B. Chandler, III, Attorney General, Frankfort, KY, Dennis W. Shepherd, Kent T. Young, William L. Daniel, II, Assistant

Attorneys General, Office of Attorney General, Criminal Appellate Division, Frankfort, for appellee Commonwealth of Kentucky (1998–SC–0963–TG).

COOPER, Justice.

On June 13, 1997, Osama Shalash was fatally shot in the Lexington Mall parking lot in front of Perkins' Restaurant in Lexington, Kentucky. Appellants Gerald Young, Erskin Thomas and Darrell Morbley were jointly indicted for his murder. At trial, the Commonwealth proved that Shalash and Young were cocaine traffickers and that Young regularly purchased large quantities of cocaine from Shalash for resale to lesser dealers. There was evidence that Young intended to purchase $50,000.00 worth of cocaine from Shalash, but that Shalash only had $25,000.00 worth of cocaine to sell. Young paid Shalash $25,000.00 for the cocaine and entrusted the remaining $25,000.00 to the possession of one of Young's associates, Leslie Mulligan. There was evidence that Young had previously "shorted" Shalash on another drug transaction. The Commonwealth's theory of the case was that Shalash robbed Mulligan of the $25,000.00 at gunpoint; and, in revenge, Young hired Thomas to kill Shalash. To that end, Young arranged a meeting with Shalash at the Lexington Mall parking lot. Morbley, another of Young's associates, drove Thomas to and from the Lexington Mall where Thomas shot and killed Shalash. Thomas was convicted of murder and sentenced to life in prison without benefit of probation or parole for twenty-five years. Young was convicted of complicity to murder and sentenced to death. Morbley was convicted of facilitation of murder and sentenced to five years in prison.

Young and Thomas appeal to this Court as a matter of right. Ky. Const. § 110(2)(b); KRS 532.075(1). Morbley's appeal was transferred to this Court so that all three appeals could be considered together. CR 74.02(2). We reverse Young's sentence of death because there is no aggravating circumstance applicable to his participation in the murder of Shalash. KRS 532.025(2), (3). In all other respects, the convictions and sentences imposed upon Appellants are affirmed.

## I. AGGRAVATING CIRCUMSTANCE.

■ A sentence of death or of life without benefit of probation or parole for twenty-five years cannot be imposed unless the jury has found beyond a reasonable doubt and designated in writing that at least one of the statutory aggravating circumstances enumerated in KRS 532.025(2)(a), or another aggravating circumstance "otherwise authorized by law,"[1] applies to the defendant. KRS 532.025(2),(3); *see Smith v. Commonwealth*, Ky., 599 S.W.2d 900, 912 (1980). The parties to this appeal agree that the only statutory aggravating circumstance applicable to the facts of this case is KRS 532.025(2)(a)4, *viz:*

1. In *Harris v. Commonwealth*, Ky., 793 S.W.2d 802, 805 (1990), *cert. denied*, 499 U.S. 924, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991), we held that capital punishment could be imposed upon a defendant convicted of kidnapping if he also murdered his victim during the course of the kidnapping. Kidnapping is a capital offense and *Harris* holds that murder, though not an aggravating circumstance enumerated in KRS 532.025(2)(a), is an "aggravating circumstance[ ] otherwise authorized by law." KRS 532.025(2). Murder, of course, is proscribed by KRS 507.020. While kidnapping is enhanced to a capital offense if the victim is not released alive or subsequently dies as a result of the kidnapping, the additional element of intent to kill in KRS 507.020(1)(a) provides the statutory aggravating circumstance authorizing capital punishment for kidnapping. *St. Clair v. Roark*, Ky., 10 S.W.3d 482, 486–87 (1999).

The offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value, or for other profit.

Subsection (2)(a)4 contains the only aggravating circumstance enumerated in KRS 532.025(2) that is premised upon the defendant's motive. The others are premised upon the status of the defendant, the status of the victim, or the nature of the offense. The jury was instructed that it could impose capital punishment upon Thomas, the hired killer, only if it believed from the evidence beyond a reasonable doubt that:

The defendant committed the offense of Murder for himself or another, for the purpose of receiving money or any other thing of monetary value, or for other profit.

Thus, the instruction parroted the language of KRS 532.025(2)(a)4, and Thomas does not assert on appeal that there was insufficient evidence to warrant application of the aggravating circumstance to him. The jury was instructed that it could impose capital punishment upon Young, who hired Thomas to kill Shalash, only if it believed from the evidence beyond a reasonable doubt that:

The defendant committed the offense of Complicity to Murder and the murder was committed by Erskin Thomas, for the purpose of receiving money or any

other thing of monetary value, or for other profit.

■ Of course, the jury had already found Young guilty of complicity to murder; and there was no evidence that Young's motive in hiring Thomas to kill Shalash was "for the purpose of [Young] receiving money or any other thing of monetary value, or for other profit." The instruction authorized the imposition of capital punishment upon Young if the jury believed that *Thomas* killed Shalash "for the purpose of [Thomas] receiving money or any other thing of monetary value, or for other profit." The issue here is whether an accomplice to murder, whose motive was revenge, can be sentenced to death because the killer's motive was monetary gain.[2] We have not previously been required to decide whether KRS 532.025(2)(a)4 authorizes imposition of the death penalty upon one who hires another to kill, but whose motive in doing so is unrelated to "receiving money or any other thing of monetary value, or for other profit."[3]

Prior to the adoption of the penal code, Kentucky's murder statute provided simply:

Any person who commits willful murder shall be punished by confinement in the penitentiary for life, or by death.

KRS 435.010 (repealed 1974 Ky.Acts, ch. 406, § 336, eff. January 1, 1975). Under that statute, whether a convicted murderer

---

**2.** We do not address the Commonwealth's contention that this issue was not preserved by timely objection. In reviewing a conviction in which the death penalty has been imposed, all claims of error, including those which are unpreserved, are addressed on appeal unless the failure to object can fairly be attributed to trial strategy, or if the error can fairly be characterized as harmless. KRS 532.075(2); *Sanders v. Commonwealth*, Ky., 801 S.W.2d 665, 668 (1990), *cert. denied,* 502 U.S. 831, 112 S.Ct. 107, 116 L.Ed.2d 76 (1991). Neither of those circumstances apply

here, because Young could not have been sentenced to death absent proof and a finding of the KRS 532.025(2)(a)4 aggravator.

**3.** In *Brown v. Commonwealth,* Ky., 780 S.W.2d 627 (1989), *cert. denied,* 494 U.S. 1087, 110 S.Ct. 1825, 108 L.Ed.2d 954 (1990), there was evidence that the defendant who hired the killer intended to share in the proceeds of the victim's life insurance policy. *Id.* at 630.

would be sentenced to death or to life in prison was left to the unfettered discretion of the jury. By 1962, similar statutes existed in every jurisdiction in the United States that had not abolished the death penalty. *Model Penal Code and Commentaries,* Part II, § 210.6, Comment 4(c), at 131 (A.L.I.1980) (hereinafter *Commentaries* ). In 1959, the American Law Institute adopted a Model Penal Code provision that set forth aggravating and mitigating circumstances to guide judges and juries in determining whether capital punishment would be appropriate in a particular case. *Id.,* Comment 1, at 110, Comment 6, at 136–42. The aggravating circumstance in the Model Penal Code that corresponds to KRS 532.025(2)(a)4 is found at Section 210.6(3)(g): "The murder was committed for pecuniary gain." As of 1972, no American jurisdiction had adopted Section 210.6 of the Model Penal Code. *Commentaries, supra,* Comment 13, at 167–68.

In *McGautha v. California,* 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), it was argued on behalf of the condemned murderer that the absence of standards to guide a jury's discretion on the issue of capital punishment was unconstitutional as being "fundamentally lawless" and, thus, in violation of the Due Process Clause of the Fourteenth Amendment. *Id.* at 196, 91 S.Ct. at 1461. Addressing this contention, Justice Harlan traced the history of the death penalty from Exodus 21:12–13 through the laws of England and the United States. *Id.* at 197–203, 91 S.Ct. at 1462–65; *see also Commentaries, supra,* Comment 4, at 121–32 and M. Coan, *Symposium on the New Kentucky Penal Code: Classification of Offenses and Disposition of Offenders,* 61 Ky.L.J. 734, 738–39 (1972–73). To summarize, the common law rule mandated death for all convicted murderers. Subsequent legislative enactments distinguished between degrees of homicide, retaining the mandatory death sentence only for murder in the first degree. Juries, however, simply convicted of a lesser degree of homicide in those cases where they chose not to impose the death penalty, and legislatures accepted this "jury nullification" by amending their statutes to grant juries the discretion they were already exercising.

> Guided by neither rule nor standard, "free to select or reject as it [sees] fit," a jury that must choose between life imprisonment and capital punishment can do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life or death.

*Witherspoon v. Illinois,* 391 U.S. 510, 519, 88 S.Ct. 1770, 1775, 20 L.Ed.2d 776 (1968) (quoting *People v. Bernette,* 30 Ill.2d 359, 197 N.E.2d 436, 443 (1964)).

> [O]ne of the most important functions any jury can perform in making such a selection is to maintain a link between contemporary community values and the penal system—a link without which the determination of punishment could hardly reflect "the evolving standards of decency that mark the progress of a maturing society."

*Id.* at 519–20 n. 15, 88 S.Ct. at 1775–76 (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958)).

Citing these precedents, the Supreme Court in *McGautha, supra,* rejected the Due Process argument against discretionary jury sentencing.

> In the light of history, experience, and the present limitations of human knowledge, we find it quite impossible to say that committing to the untrammeled discretion of the jury the power to pronounce life or death in capital cases is offensive to anything in the Constitution. The States are entitled to assume that jurors confronted with the truly

awesome responsibility of decreeing death for a fellow human will act with due regard for the consequences of their decision and will consider a variety of factors, many of which will have been suggested by the evidence or by the arguments of defense counsel. For a court to attempt to catalog the appropriate factors in this elusive area could inhibit rather than expand the scope of consideration, for no list of circumstances would ever be really complete. The infinite variety of cases and facets to each case would make general standards either meaningless "boiler plate" or a statement of the obvious that no jury would need.

402 U.S. at 207–08, 91 S.Ct. at 1467–68.

That was in 1971. In 1972, a plurality[4] of the Supreme Court held in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) that statutes leaving imposition of the death penalty entirely to the unguided discretion of jurors violated the *Eighth* Amendment proscription against cruel and unusual punishment. *Id.* at 306–10, 92 S.Ct. at 2760–63 (Stewart, J., concurring); *id.* at 310–14, 92 S.Ct. at 2763–65 (White, J., concurring); *see Gregg v. Georgia*, 428 U.S. 153, 169, n. 15, 96 S.Ct. 2909, 2923, 49 L.Ed.2d 859 (1976) ("[s]ince five Justices wrote separately in support of the judgments in *Furman,* the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds—Mr. Justice Stewart and Mr. Justice White"). *Furman* did not decide, however, whether statutes mandating the death penalty would be unconstitutional.

*See* 408 U.S. at 257, 92 S.Ct. at 2735–36 (Douglas, J., concurring); 408 U.S. at 307–08, 92 S.Ct. at 2761 (Stewart, J., concurring).

Meanwhile, pursuant to a joint resolution of the 1968 Kentucky General Assembly,[5] the Kentucky Crime Commission had prepared a draft of a proposed new penal code for Kentucky. The draft was completed and published in November 1971 and, after some revision, was enacted by the 1972 General Assembly[6] with an effective date of July 1, 1974. J. Palmore, *Preface to Symposium on Kentucky Penal Code,* 61 Ky.L.J. 620 (1972–73). The 1972 version of the new murder statute, KRS 507.020, was enacted before the rendition of *Furman* and did not change the penalty provision of the former statute, KRS 435.010, but continued to permit the jury to impose death or life in prison in its discretion. The new penal code did not go into effect on July 1, 1974, as originally scheduled, but was reenacted by the 1974 General Assembly with modifications and given a new effective date of January 1, 1975.[7] The murder statute, KRS 507.020, was amended to *require* imposition of the death penalty under six aggravating circumstances, thus avoiding the *Furman* problem of leaving the decision of life or death to the unfettered discretion of a jury. If a jury found a defendant guilty of aggravated murder, there was no discretion to exercise; death was mandated.[8] One of the six aggravating circumstances in the 1974 version of KRS 507.020 was that "[t]he defendant's act of killing was intentional and was *for profit or hire.*"[9] (Emphasis added.)

4. Justices Brennan and Marshall concurred in the result but asserted that capital punishment is *per se* unconstitutional.

5. 1968 Ky.Acts, ch. 230.

6. 1972 Ky.Acts, ch. 385.

7. 1974 Ky.Acts, ch. 406, § 337.

8. 1974 Ky.Acts, ch 406, § 61(2), 275(1).

9. 1974 Ky.Acts, ch. 406, § 61(2)(a).

Following the invalidation of its statutory scheme in *Furman,* Georgia enacted a new death penalty statute incorporating the Model Penal Code approach of providing statutory aggravating and mitigating circumstances to guide the jury in its decision whether to impose the death penalty in a given case.[10] However, the language of Georgia's "pecuniary gain" aggravator differed from the requirement in Section 210.6(3)(g) of the Model Penal Code that "the *murder was committed* for pecuniary gain," (emphasis added), providing instead that "[t]he *offender committed the offense* of murder for himself or another, for the purpose of receiving money or any other thing of monetary value." Ga.Code Ann. § 17–10–30(b)(4) (emphasis added). Thus, whereas Section 210.6(3)(g) of the Model Code required that the motive for the *offense* must have been pecuniary gain, the Georgia statute required that the motive of the *offender, i.e.,* the *defendant,* must have been pecuniary (monetary) gain.

States that have adopted the language of the Model Penal Code have found the "motive for the offense" requirement inclusive enough to apply not only to the hired killer, but also to the one who procured his/her services. *E.g., Wilson v. State,* 99 Nev. 362, 664 P.2d 328, 337 (1983); *Hopkinson v. State,* 664 P.2d 43, 59 (Wyo. 1983), *cert. denied,* 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983). Georgia, on the other hand, has not relied on the "motive of the offender" requirement in subsection (b)(4) of its statute to authorize capital punishment for one who hires another to commit murder, but on a different aggravating circumstance contained in subsection (b)(6) of its statute, *viz:* "The offender caused or directed another to commit the murder or committed murder as an agent or employee of another person." Ga.Code Ann. § 17–10–30(b)(6);

*Castell v. State,* 250 Ga. 776, 301 S.E.2d 234, 250 (1983), *on denial of new trial,* 252 Ga. 418, 314 S.E.2d 210 (1984), *cert. denied,* 469 U.S. 873, 105 S.Ct. 230, 83 L.Ed.2d 159 (1984); *cf. Whittington v. State,* 252 Ga. 168, 313 S.E.2d 73, 82 (1984).

In *Gregg v. Georgia, supra,* the United States Supreme Court upheld Georgia's new death penalty statute, finding that the enumerated aggravating circumstances were not so vague or so broad as to provide inadequate guidance to juries charged with the duty of recommending or imposing sentences in capital cases.

The basic concern of *Furman* centered on those defendants who were being condemned to death capriciously and arbitrarily. Under the procedures before the Court in that case, sentencing authorities were not directed to give attention to the nature or circumstances of the crime committed or to the character or record of the defendant. Left unguided, juries imposed the death sentence in a way that could only be called freakish. The new Georgia sentencing procedures, by contrast, focus the jury's attention on *the particularized nature of the crime and the particularized characteristics of the individual defendant.* While the jury is permitted to consider any aggravating or mitigating circumstances, *it must find and identify at least one statutory aggravating factor before it may impose, a penalty of death.* In this way the jury's discretion is channeled. No longer can a jury wantonly and freakishly impose the death sentence; *it is always circumscribed by the legislative guidelines.*

*Id.* at 206–07, 96 S.Ct. at 2940–41 (emphasis added).

---

10. 1973 Ga.L., p. 159, § 3.

On the same day it rendered *Gregg*, the Supreme Court also rendered *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), which held North Carolina's mandatory death penalty statute unconstitutional because, *inter alia*, it accorded "no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense." *Id.* at 304, 96 S.Ct. at 2991. Of course, *Woodson* also effectively invalidated the 1974 version of KRS 507.020(2).

In response to *Gregg* and *Woodson*, the Kentucky General Assembly was called into special session in December 1976 and again amended KRS 507.020(2),[11] this time to provide merely that "[m]urder is a capital offense," and enacted KRS 532.025, which adopted the Georgia/Model Penal Code approach of (1) enumerating specific aggravating and mitigating circumstances to guide the jury in its penalty decision and (2) requiring a finding beyond a reasonable doubt of the existence of at least one statutory aggravating circumstance before capital punishment can be imposed. As noted *supra*, the aggravating circumstance specified in KRS 532.025(2)(a)4 is that "[t]he offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value, or for other prof-

it." Thus, the General Assembly adopted verbatim subsection (b)(4) of the Georgia statute[12] but added the additional clause "or for other profit," which it retained from the "for profit or hire" language of the 1974 version of KRS 507.020(2). Significantly, the General Assembly did not retain the "for ... hire" language of the 1974 statute and did not adopt the "directed another" aggravator found in subsection (b)(6) of the Georgia statute.

At present, the laws of thirty-eight states permit imposition of the death penalty upon conviction of murder.[13] All thirty-eight require a finding of at least one statutory aggravating circumstance as a prerequisite to imposition of the death penalty. Montana[14] and Virginia[15] are the only death penalty states that do not include a "for pecuniary gain" aggravator in their statutory schemes. Thirteen states have adopted provisions identical or virtually identical to Section 210.6(3)(g) of the Model Penal Code, *i.e.*, that the *offense*, as opposed to the *offender*, was motivated by pecuniary gain.[16] Eighteen states, including three of those with provisions identical or virtually identical to Model Penal Code § 210.6(3)(g), have statutes specifically providing that hiring or otherwise procuring another to commit murder is an aggravating circumstance.[17]

---

**11.** 1976 Ky.Acts (ex. sess.), ch. 15, §§ 1, 2.

**12.** The Georgia statute served as the model for KRS 532.025. Palmore and Lawson, *Kentucky Instructions to Juries (Criminal)*, § 2.08 (Comment) (3d ed. Anderson 1975, 1979 supp.).

**13.** Those that do not permit imposition of the death penalty are Alaska, Hawaii, Iowa, Maine, Massachusetts, Michigan, Minnesota, North Dakota, Rhode Island, Vermont, West Virginia and Wisconsin.

**14.** Mont.Code Ann. § 46–18–303.

**15.** Va.Code Ann. § 19.2–264.2.

**16.** Ala.Code § 13A–5–49(6), Ark.Code Ann. § 5–4–604(6); Colo.Rev.Stat.Ann. § 16–11–103(5)(h); Del.Code Ann. tit. 11, § 4209(e)(1)o; Fla.Stat.Ann. § 921.141(5)(f); Idaho Code § 19–2515(h)(4); Miss.Code Ann. § 99–19–101(5)(f); Neb.Rev.Stat. § 29–2523(1)(c); Nev.Rev.Stat. § 200.033–6; N.H.Rev.Stat.Ann. § 630:5 VII(i); N.C.Gen. Stat. § 15A–2000(e)(6); Utah Code Ann. § 76–5–202(1)(f); Wyo.Stat.Ann. § 6–2–102(h)(vi).

**17.** Ariz.Rev.Stat. § 13–703F–4; Conn.Gen. Stat. § 53a–46a(i)(5); Idaho Code § 19–2515(h)(4); 720 Ill.Comp.Stat. § 5/9–1(b)(5); Ind.Code § 35–50–2–9(b)(5); Kan.Stat.Ann.

Colorado's statute not only has the Model Penal Code aggravator, but also has an aggravating circumstance that the defendant was a party to an agreement to kill another.[18] California has both the Model Code aggravator and a separate provision authorizing the death penalty if the defendant was an accomplice with another to whom an aggravating circumstance applies and if the defendant intended that the victim would be killed.[19] New Mexico [20] and Ohio [21] have an aggravating circumstance that the offense "was committed for hire." In addition to Georgia, three other states have provisions with language similar to KRS 532.025(2)(a)4, *i.e.*, that the *offender's* motive was pecuniary gain, but each, like Georgia, has also adopted the additional aggravating circumstance that "[t]he offender caused or directed another to commit murder...." [22] Kentucky has the only statutory scheme with a "pecuniary gain" aggravator containing neither the Model Penal Code language applying the aggravator to the offense, as opposed to the offender, nor an aggravating circumstance specifically applicable to one who hires or otherwise procures another to commit murder.

■ The death penalty cannot be imposed simply because we or the jury believe the actions or motives of a particular defendant are deserving of capital punishment. That is the kind of discretionary, *ad hoc* application of the death penalty specifically condemned in *Furman v. Georgia, supra.* In *Gregg v. Georgia, supra,* the United States Supreme Court upheld Georgia's new death penalty statute only because it contained *legislative* guidelines circumscribing the imposition of the death penalty. 428 U.S. at 206–07, 96 S.Ct. at 2940–41. It is equally clear that individualized consideration is a Constitutional prerequisite for imposition of capital punishment. *Id.; see also Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978); *Woodson v. North Carolina, supra,* 428 U.S. at 304, 96 S.Ct. at 2991. As observed by the Supreme Court of Missouri:

To state the obvious, the death penalty differs from all other forms of criminal sanction. The death penalty reflects a societal judgment that a person's acts render them [sic] no longer fit to be among us. Such a judgment is of such a magnitude and so final that jury deliberations over the subject must be carefully channeled to consider only the legal justifications for the punishment and not the more broad, often emotional response to the crime in general. Thus, jury instructions setting out statutory aggravating circumstances—those circumstances that, if found, justify the

---

§ 21–4625(4); La.Code Crim.Proc.Ann. art. 905.4A(5); Md.Ann.Code art. 27, § 413(d)(7); Neb.Rev.Stat. § 29–2523(1)(c); N.J.Stat.Ann. § 2C:11–3–c(4)(e); N.Y.Penal Law § 125.27–1(a)(vi); Okla.Stat. tit. 21, § 701.12–3; Or. Rev.Stat. § 163.095(1)(b); 42 Pa.Cons.Stat. Ann. § 9711(d)(2), Tenn.Code Ann. § 39–13–204(i)(4); Tex.Penal Code Ann. § 19.03(a)(3); Utah Code Ann. § 76–5–202(1)(g); Wash.Rev. Code Ann. § 10.95.020(5).

**18.** Colo.Rev.Stat.Ann. § 16–11–103(5)(e).

**19.** Cal.Penal Code § 190.2(a)(1) and (c). The requirement that an accomplice must have intended that the victim be killed in order to

be subjected to the death penalty was mandated by *Ennund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); *but see Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (non-triggerman accomplice can be sentenced to death under facts constituting felony murder).

**20.** N.M.Stat.Ann. § 31–20A–5F.

**21.** Ohio Rev.Code Ann. § 2929.04(2).

**22.** Mo.Rev.Stat. § 565.032–2(4) and (6); S.C.Code Ann. § 16–3–20(C)(a)(4) and (6); S.D.Codified Laws § 23A–27A–1(3) and (5).

death sentence—must be unquestionably focused on the convicted murderer's own character, record and individual mindset as betrayed by her own conduct. Although it is permissible to find a person guilty of murder for acts done in concert with another, it is never permissible to sentence a person to death for acts of another.

*State v. Isa,* 850 S.W.2d 876, 902–03 (Mo. 1993).

■■■■ In other words, the death penalty cannot be vicariously imposed. Absent a statutory aggravating circumstance specifically applicable to the defendant or the defendant's own conduct, he/she cannot be subjected to the death penalty. Unlike the legislatures of thirty-five of the other thirty-seven states that have death penalty statutes, our legislature has chosen not to include in KRS 532.025(2) an aggravating circumstance applicable to one who hired, procured or directed another to commit murder. Nor has our legislature, unlike the California legislature, enacted a provision authorizing imposition of the death penalty upon one who is an accomplice of another to whom an aggravating circumstance applies. The specification of aggravating circumstances is the legislature's prerogative, not ours. By its unambiguous language,[23] KRS 532.025(2)(a)4 applies only to a defendant who commits the offense of murder "for the purpose of receiving money or any other thing of monetary value, or for other profit." While the statute clearly applies to Thomas, the hired killer in this case, it does not apply to Young whose motive in procuring the murder of Shalash was revenge, not monetary gain.

■■■■ We find the cases cited in the dissenting opinion, *ante,* to be inapposite.

*Skinner v. Commonwealth,* Ky., 864 S.W.2d 290 (1993), *Commonwealth v. Yeager,* Ky., 599 S.W.2d 458 (1980), and *Ray v. Commonwealth,* Ky., 550 S.W.2d 482 (1977), all were cases in which an accomplice was found guilty by complicity of an offense that was enhanced to a higher degree because it was committed while the principal actor was armed with a deadly weapon or because the principal actor inflicted physical injury on the victim. Those cases simply hold that under KRS 502.020(1), the accomplice is guilty of the same offense as the principal. In fact, KRS 502.020(1) provides: "A person is guilty of *an offense* committed by another person when...." (Emphasis added.) However, those cases do not hold that the accomplice must be punished the same as the principal. For example, a principal might be ineligible for probation, shock probation, or conditional discharge because he/she was on probation or parole at the time of the offense. KRS 533.060(2). That does not mean that an accomplice who was not on probation or parole at the time of the offense would also be ineligible for probation, shock probation or conditional discharge. More specifically, the fact that a principal might be subject to capital punishment because he/she has a prior record of conviction for a capital offense, KRS 532.025(2)(a)1, does not mean that an accomplice without such a prior record would also be subject to capital punishment. Of course, a different result would obtain if the aggravating circumstance, itself, was a separate offense, *e.g.,* robbery in the first degree, KRS 532.025(2)(a)2, and the accomplice was also guilty by complicity of the aggravating offense.

**23.** Even if the language were ambiguous, the "rule of lenity" would require us to give it the more lenient interpretation. *Commonwealth v. Lundergan,* Ky., 847 S.W.2d 729, 731 (1993); *Roney v. Commonwealth,* Ky., 695 S.W.2d 863, 864 (1985).

In *Tison v. Arizona, supra,* note 19, the issue was not, as here, whether an aggravating factor applicable only to the principal could be vicariously applied to an accomplice. In fact, there were three aggravating factors specifically applicable to the accomplice's conduct in *Tison.* 481 U.S. at 142, 107 S.Ct. at 1680. The only issue was whether *Enmund v. Florida, supra,* note 19, precluded imposition of the death penalty because the non-triggerman accomplice to a fatal robbery did not intend that the robbery victims be killed. *Tison* held that *Enmund* does not preclude capital punishment in a situation where the non-triggerman accomplice was a major participant in the robbery, he knew that lethal force would be employed to accomplish the robbery, and his participation with such knowledge amounted to reckless indifference to human life. 481 U.S. at 158, 107 S.Ct. at 1688. As here, the accomplice's eligibility for capital punishment depended not on the *mens rea* of the triggerman, but on his own *mens rea* and the nature of his own conduct.

Having determined that Young was improperly sentenced to death, we need not address the other issues on appeal that apply only to death penalty cases. Nor are we bound by the mandate of KRS 532.075(2) to consider other issues that were not properly preserved for appellate review.

## II. JURY ISSUES.

### A. *Peremptory strikes.*

■ Since this was a joint trial of three defendants and alternate jurors were being seated, Appellants were entitled to a total of fifteen peremptory strikes. RCr 9.40; *Springer v. Commonwealth,* Ky., 998 S.W.2d 439, 443–45 (1999). Instead, they were allotted a total of only twelve peremptories. As in *Gabow v. Commonwealth,* Ky., 34 S.W.3d 63, 74–75 (2000),

Appellants did not object to the trial judge's erroneous interpretation of RCr 9.40 but argued only that the trial judge had the discretion to grant more peremptory strikes to defendants in a death penalty case than are required by the rule. Thus, as in *Gabow,* this issue was not preserved for appellate review. *Kentucky Farm Bureau Mut. Ins. Co. v. Cook,* Ky., 590 S.W.2d 875, 877 (1979).

### B. *Failure to strike for cause.*

Appellants Young and Thomas assert error in the trial court's refusal to strike eight jurors for cause, all of whom were subsequently excused by peremptory strikes.

■ *Juror No. 932* was a scout pilot for the National Guard. He advised during general voir dire that he had helped the Kentucky State Police search for marijuana as part of the marijuana eradication task force; that drug suspects had shot at him and even wounded him on one occasion; that he had testified as a witness in a prosecution for drug trafficking; and that his position on drugs was "zero tolerance." He also advised that one of his employees was married to a police officer. Of course, although there would be evidence that both Young and Shalash were drug dealers, Appellants were charged with murder, not with trafficking in controlled substances. Juror No. 932 stated that his background would not affect his ability to sit as an impartial juror on this case. He also advised during individual voir dire that he could consider the full range of penalties and would consider mitigating factors before deciding on penalties in the event Appellants were convicted. Even if Juror No. 932 had, himself, been a police officer, such would not have required that he be excused for cause. *Sanders v. Commonwealth,* Ky., 801 S.W.2d 665, 670 (1990), *cert. denied,* 502 U.S. 831, 112 S.Ct.

107, 116 L.Ed.2d 76 (1991). There was no error in failing to excuse him for cause.

■ *Juror Nos. 891* and *904* expressed reservations about mitigating circumstances, but both indicated they would follow the court's instructions in that regard and would consider the full range of penalties. *Juror Nos. 847, 848, 874,* and *876* all held strong views in favor of the death penalty. However, each advised that he/she would consider the full range of penalties. There was no error in failing to excuse any of these jurors for cause. *Bowling v. Commonwealth,* Ky., 873 S.W.2d 175, 177 (1993), *cert. denied,* 513 U.S. 862, 115 S.Ct. 176, 130 L.Ed.2d 112 (1994) (juror not disqualified because he/she favors severe penalties, so long as the juror will consider the full range of penalties); *cf. Williams v. Commonwealth,* Ky. App., 829 S.W.2d 942, 943 (1992) (juror can rehabilitate himself by clarifying his views).

■ *Juror No. 808* also held strong views in favor of the death penalty, but stated he would consider the full range of penalties. In response to a question from defense counsel, No. 808 stated that if he thought the death penalty appropriate, he did not know if he would consider a lesser penalty. Of course, if he had already considered the full range of penalties and decided that death was the most appropriate penalty, it stands to reason that he would not then consider a penalty that he had already decided was inappropriate. No error occurred in failing to excuse this juror for cause. *Bowling v. Commonwealth, supra,* at 177.

### C. Excusals for cause.

■ Appellants assert error in the trial judge's decision to excuse two jurors for cause because they advised that they could not consider the death penalty in this case. *Juror No. 794* was asked if she could consider the full range of penalties and responded that she could not consider the death penalty. When asked a second time, she responded that she would have a "hard time." When asked a third time, she responded that she did not think she could consider the death penalty. *Juror No. 831* advised that she could consider the death penalty only in a case of multiple murders. A juror is disqualified to sit on a case in which the death penalty is an available punishment if that juror states that he/she could not impose the death penalty. *Davis v. Commonwealth,* Ky., 795 S.W.2d 942 (1990); *Moore v. Commonwealth,* Ky., 771 S.W.2d 34 (1988), *cert. denied,* 494 U.S. 1060, 110 S.Ct. 1536, 108 L.Ed.2d 774 (1990); *Simmons v. Commonwealth,* Ky., 746 S.W.2d 393 (1988), *cert. denied,* 489 U.S. 1059, 109 S.Ct. 1328, 103 L.Ed.2d 596 (1989); *Stanford v. Commonwealth,* Ky., 734 S.W.2d 781 (1987), *aff'd,* 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). The trial judge did not abuse her discretion in excusing these two jurors for cause.

### D. Alleged sleeping juror.

■ Appellants claim a juror slept during portions of the guilt phase closing arguments and fell asleep again during Young's penalty phase argument. At the conclusion of the penalty phase arguments, Appellants moved for a mistrial on grounds that the juror had not heard all of the evidence, thus could not render an independent decision. The trial judge had previously inquired about the fact that the juror often had her eyes closed and the juror had explained that she suffered from sickle cell anemia, which caused her to close her eyes. In response to the motion for a mistrial, the juror was called to the bench where she insisted that she had heard everything that had occurred during the trial. There was no error in overruling the motion for mistrial. *Shrout v.*

*Commonwealth,* 226 Ky. 660, 11 S.W.2d 726, 727 (1928).

## III. SUFFICIENCY OF THE EVIDENCE.

■ Appellants claim they should have received directed verdicts of acquittal because the primary witnesses for the Commonwealth were incredible as a matter of law. The Commonwealth's key witnesses were Young's girlfriend, Johnetta Girard, and a jailhouse informant, Danny Craddock. Girard testified that she was present during the $25,000.00 cocaine transaction between Young and Shalash; that Young told her that Shalash had robbed Leslie Mulligan of the remaining $25,000.00; that he was going to have Shalash killed for it; that she (Girard) met Thomas at the airport, drove him to a motel, and paid for his motel room with money given to her by Young; that on the day of the murder, she drove Young to the Lexington Mall parking lot in Young's Mitsubishi automobile; that Morbley and Thomas followed in a maroon Cadillac driven by Morbley; and that as she, Young, Shalash and Shalash's girlfriend, Kim Pruitt, were preparing to enter Perkins' Restaurant, Thomas ran up behind them and shot and killed Shalash. Craddock testified that he was incarcerated with Young at the Scott County Detention Center from August 11 – September 2, 1997 and that Young told him that he paid $25,000.00 to have Shalash killed because Shalash had robbed Leslie Mulligan.

■ Appellants point out that the evidence offered by Girard and Craddock was contradicted in some respects by other witnesses. Specifically, Mulligan testified that there was no drug deal and that she was not robbed. Appellants also claim that neither Girard nor Craddock are worthy of belief because they were given "deals" in exchange for their testimony.

However, the credibility of witnesses and the weight to be given to sworn testimony are for the jury to decide. *Commonwealth v. Smith,* Ky., 5 S.W.3d 126, 129 (1999); *Estep v. Commonwealth,* Ky., 957 S.W.2d 191, 193 (1997). The Commonwealth adduced sufficient evidence for reasonable jurors to conclude beyond a reasonable doubt that Appellants were guilty; thus, the trial judge properly overruled their motions for directed verdicts of acquittal. *Commonwealth v. Benham,* Ky., 816 S.W.2d 186 (1991).

■ Additionally, Appellant Morbley claims there was insufficient evidence to convict him of criminal facilitation of murder. KRS 506.080(1) provides:

A person is guilty of criminal facilitation when, acting with knowledge that another person is committing or intends to commit a crime, he engages in conduct which knowingly provides such person with the means or opportunity for the commission of the crime and which in fact aids such person to commit the crime.

■ Morbley asserts there was no evidence that he had prior knowledge that Thomas intended to kill Shalash. As explained in *Chumbler v. Commonwealth,* Ky., 905 S.W.2d 488 (1995), to convict of complicity, the jury must find the defendant intended that the murder occur, but to convict of facilitation, the jury need find only that the defendant knew the principal actor was going to commit a crime. Either way, intent (necessary to convict of complicity) or knowledge (necessary to convict of facilitation) can be inferred from the defendant's conduct. *Id.* at 499.

## IV. ADMISSIBILITY OF EVIDENCE.

### A. *Hearsay: KRE 802.*

Officer Lee Shimizu arrived at Perkins' Restaurant approximately seven minutes

after the shooting and interviewed Joyce Combs, a waitress at the restaurant who claimed to have witnessed the shooting. Combs told Shimizu that the killer was a black male, about 5'6", medium complexion, wearing a dark shirt and a white baseball cap, and that he left the scene in a 1980's model maroon Cadillac with a white top. Shimizu broadcast this description over the police radio. Later, at the police station, Combs described the killer as weighing approximately 150 pounds, eighteen or nineteen years old, and wearing a red baseball cap. She was unable to identify Thomas from a photo line-up. Thomas is a 6'1" black male, dark complexion, weighing 180 pounds and thirty-one years old at the time of the murder. Other witnesses who saw Thomas run from Perkins' Restaurant to the maroon Cadillac described him as "thin," "small in build," "medium to strong build," and "in his early twenties, mid-twenties, not real tall, probably five foot six inches to five foot eight inches."

By trial, Joyce Combs had disappeared. Appellants sought to introduce her description of the murderer through the testimony of Officer Shimizu. The trial judge sustained the Commonwealth's objection to this hearsay evidence. Appellants assert that Shimizu's repetition of Combs's description of the killer was admissible as either a present sense impression, KRE 803(1), or an excited utterance, KRE 803(2).

■■■■ Combs's statement to Shimizu was not a present sense impression because the statement was not made contemporaneously with the event she was describing or immediately thereafter. *Fields v. Commonwealth,* Ky., 12 S.W.3d 275, 279–80 (2000) (audio description of crime scene investigation recorded by investigating officer shortly after completion of the investigation was not a present sense impres-

sion because the narration described events which had already occurred); *Slaven v. Commonwealth,* Ky., 962 S.W.2d 845, 854–55 (1997) (declarant's statement that the defendant was "not at home" was a present sense impression, but her statement that the defendant had come home and subsequently departed was not within the exception because it described events which had already occurred); *Jarvis v. Commonwealth,* Ky., 960 S.W.2d 466, 469–70 (1998) (child's statement that she saw the defendant kill her mother was not within the exception because there was no evidence that the statement was made as the killing occurred or immediately thereafter).

■■■■ Nor was Combs's description of the killer admissible as an excited utterance. In *Jarvis v. Commonwealth, supra,* we repeated the factors to be weighed in determining whether an out-of-court statement is admissible under KRE 803(2):

(i) lapse of time between the main act and the declaration, (ii) the opportunity or likelihood of fabrication, (iii) the inducement to fabrication, (iv) the actual excitement of the declarant, (v) the place of the declaration, (vi) the presence there of visible results of the act or occurrence to which the utterance relates, (vii) whether the utterance was made in response to a question, and (viii) whether the declaration was against interest or self-serving.

*Id.* at 470 (quoting *Souder v. Commonwealth,* Ky., 719 S.W.2d 730, 733 (1986), in turn quoting R. Lawson, *The Kentucky Evidence Law Handbook* § 8.60B (2d ed. Michie 1984)). We clarified in *Smith v. Commonwealth,* Ky., 788 S.W.2d 266, 268 (1990), *cert. denied,* 498 U.S. 852, 111 S.Ct. 146, 112 L.Ed.2d 112 (1990) that the above criteria do not pose a true-false test for admissibility, but rather act only as guidelines to be considered in determining

admissibility. Whether a particular statement qualifies as an excited utterance depends on the circumstances of each case and is often an arguable point; and "when this is so the trial court's decision to admit or exclude the evidence is entitled to deference." *Souder, supra*, at 733. That is but another way of saying that when the determination depends upon the resolution of a preliminary question of fact, the resolution is determined by the trial judge under KRE 104(a) on the basis of a preponderance of the evidence, *Bourjaily v. United States*, 483 U.S. 171, 175, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987); and the resolution will not be overturned unless clearly erroneous, i.e., unless unsupported by substantial evidence. *Cf. Commonwealth v. Deloney*, Ky., 20 S.W.3d 471, 473–74 (2000) (trial judge's findings of fact are not clearly erroneous if supported by substantial evidence).

Officer Shimizu testified that he chose to interview Combs because she was "not as stressed" as the other witnesses at the scene. Combs's description of the killer was not spontaneous but was in response to a direct inquiry by Shimizu. Thus, there was substantial evidence to support the trial judge's finding that Combs's statement was not an excited utterance.

■ Nor were Combs's description of the killer and her failure to identify Thomas during the photo line-up admissible under KRE 801A(a)(3) as statements "of identification of a person made after perceiving the person." That rule applies only if the declarant testifies at trial and a foundation is laid in accordance with KRE 613. KRE 801A(a). *See also Summitt v. Commonwealth*, Ky., 550 S.W.2d 548 (1977) (repetition of an eyewitness's description of the physical characteristics of the perpetrator is not admissible unless the eyewitness testifies, and then only in rebuttal of attempts to discredit her subsequent identification). Nor were they admissible as "verbal acts." *See White v. Commonwealth*, Ky., 5 S.W.3d 140 (1999).

■ The evidence sought to be elicited from Shimizu is identical to that usually objected to by defendants as "investigative hearsay." *Slaven v. Commonwealth, supra*, at 859; *Sanborn v. Commonwealth*, Ky., 754 S.W.2d 534, 541 (1988). "Investigative hearsay" is equally inadmissible against the Commonwealth as against a defendant. *Fields v. Commonwealth, supra*, at 284. A police officer may testify about information furnished to him by an absent witness only if that information tends to explain the action that was taken by the police officer as a result of the information *and* the taking of that action is an issue in the case. *Daniel v. Commonwealth*, Ky., 905 S.W.2d 76, 79 (1995); *Sanborn v. Commonwealth, supra*, at 541. If so, the out-of-court statement is not hearsay, because it is not offered to prove the truth of the matter asserted but to explain why the officer acted as he did. The fact that Shimizu caused a description of the killer to be broadcast over police radio was not at issue in the case. The only purpose for introducing the details of that description would be to prove that Combs's description did not fit Thomas; thus, it would have been offered to prove the truth of Combs's description and, thus, that Thomas was not the killer.

*B. Other crimes, wrongs, or acts: KRE 404(b).*

■ Appellants assert it was error to permit the Commonwealth to introduce evidence that Young was a drug dealer. Specifically, the Commonwealth proved that within a month before the murder, Young and Shalash traveled to Texas together to purchase a large amount of cocaine; that on another occasion, Young met Shalash at the Lexington Mall parking

lot and transferred $28,000.00 to Shalash, inferentially as payment for controlled substances; that Young "shorted" Shalash on another drug transaction; and that Shalash robbed Leslie Mulligan of the $25,000.00 that remained from the intended $50,000.00 cocaine transaction with Shalash. The evidence of the robbery was admissible to prove Young had a motive to kill Shalash, *Brown v. Commonwealth,* Ky., 983 S.W.2d 513, 516 (1999); and the evidence of the prior dealings between Young and Shalash was admissible to prove that Shalash knew Mulligan had Young's $25,000.00 and had a motive to take it, which supported the Commonwealth's theory that Shalash did, in fact, rob Mulligan (who denied being robbed) and that Young killed Shalash in revenge. This evidence falls within the "other purpose" provision of KRE 404(b)(1). *Cf. Tamme v. Commonwealth,* Ky., 973 S.W.2d 13, 29 (1998), *cert. denied,* 525 U.S. 1153, 119 S.Ct. 1056, 143 L.Ed.2d 61 (1999) (the specifically listed purposes in the rule are illustrative rather than exhaustive).

*C. Character of accused: KRE 404(a)(1).*

Appellants assert it was error to permit prosecution witnesses Girard and Craddock to testify to their fear of Young and/or Thomas, presumably on grounds that such was improper evidence of bad character. KRE 404(a); *Eldred v. Commonwealth,* Ky., 906 S.W.2d 694, 704 (1994), *cert. denied,* 516 U.S. 1154, 116 S.Ct. 1034, 134 L.Ed.2d 111 (1996).

 Girard testified that she did not tell the truth during her police interrogation because she was afraid of Young and Thomas. There was no objection to this testimony, thus it was not preserved for appellate review. KRE 103(a)(1); RCr 9.22. On another occasion, Girard testified

in response to a question by the prosecutor that she preferred not to look at Young and the other defendants. The only objection was that her answer was elicited by a leading question. Error is not preserved if the wrong reason is stated for the objection. *Tamme v. Commonwealth, supra,* at 33. Nor do either of these statements by Girard amount to palpable error under KRE 103(e) and RCr 10.26. Craddock expressed no fear of Young, but merely remarked that he (Craddock) would be a "dead man walking" when he returned to prison, presumably because of the disdain other prisoners have for jailhouse informants.

*D. Impeachment: KRE 608.*

 After the murder, Johnetta Girard was interrogated for six hours by the police and the interrogation was recorded on a number of audiotapes. At trial, Girard testified that Young had beaten her. When asked by Thomas's counsel if she had made the same accusation during her police interrogation, Girard responded that she could not recall. Thomas's attorney then proposed to play the entire six hours of audiotapes to prove that Girard had *not* told the police that Young had beaten her. The trial judge ruled that counsel for Thomas could play any portions of the tapes which contained prior inconsistent statements but that she could not play the tapes in their entirety.

Appellants do not suggest that Girard *denied* during her recorded interrogation that Young had beaten her; thus, if, as Thomas posits, she was silent in that regard, there was no prior inconsistent statement and the tapes would only have revealed the absence of a prior consistent statement. KRE 608, in its present truncated version,[24] provides only that the credibility of a witness may be attacked or

---

**24.** *See Tamme v. Commonwealth, supra,* at 29 for the legislative history of KRE 608.

supported by evidence in the form of opinion or reputation. Civil Rule 43.07 provides that a witness may be impeached "by contradictory evidence, by showing that he had made statements different from his present testimony, or by evidence that his general reputation for untruthfulness renders him unworthy of belief." Neither rule permits impeachment by the absence of a prior consistent statement. We have held that when a witness at trial professes not to remember making a prior assertion, he/she can be impeached by introducing a prior statement of the witness wherein the assertion *was* made. *Manning v. Commonwealth*, Ky., 23 S.W.3d 610, 613 (2000); *see also Wise v. Commonwealth*, Ky.App., 600 S.W.2d 470, 472 (1978). The prior assertion is then treated as substantive evidence under Kentucky law. KRE 801A(a)(1), *Jett v. Commonwealth*, Ky., 436 S.W.2d 788 (1969). We are cited to no authority that permits a witness, who professes not to remember making a prior assertion, to be impeached by introducing a prior statement of the witness wherein the assertion *was not* made.

E. *"Rule of completeness:" KRE 106.*

■ Thomas's counsel also asserted at trial that if Thomas played any portion of the audiotapes for purpose of impeachment, KRE 106 would permit Young to play the remainder of the tapes in their entirety. On appeal, Young (who did not request permission to play the tapes at trial) argues that it was necessary to play the entire six hours to show how Girard's statement "evolved" during the interrogation. Since Young did not request that the remainder of the audiotapes be played, the argument is not preserved for appellate review. Regardless, KRE 106 only applies to "an adverse party," and Young and Thomas were not adverse parties. Furthermore, the rule does not require introduction of the entire writing or recorded statement, but only so much thereof "which ought in fairness to be considered contemporaneously with it," *i.e.*, that portion which concerns the specific matter introduced by the adverse party. *White v. Commonwealth*, 292 Ky. 416, 166 S.W.2d 873, 877 (1942). The issue is whether "the meaning of the included portion is altered by the excluded portion." *Commonwealth v. Collins*, Ky., 933 S.W.2d 811, 814 (1996). The objective of KRE 106 "is to prevent a misleading impression as a result of an incomplete reproduction of a statement." *Id.* (quoting R. Lawson, *The Kentucky Evidence Law Handbook* § 1.20, at 48 (3d ed. Michie 1993)). *See Gabow v. Commonwealth, supra*, at 68 n. 2. Thus, Young would not have been permitted to play the audiotapes in their entirety even if he had so requested.

F. *Relevancy of demonstrative evidence: KRE 401, KRE 403.*

■ After being shot, Shalash crawled through the entrance of Perkins' Restaurant where he died. The death scene was captured by a video surveillance camera, and the videotape was played for the jury at trial. We have previously held that a videotape of a crime scene, including the position of the victim's body and the location and nature of the victim's injuries, is just as admissible as a photograph, assuming a proper foundation is laid. *Bedell v. Commonwealth*, Ky., 870 S.W.2d 779 (1993); *Milburn v. Commonwealth*, Ky., 788 S.W.2d 253 (1989). This is true, even though the scene depicted may be gruesome. *Mills v. Commonwealth*, Ky., 996 S.W.2d 473, 489 (1999), *cert. denied*, 528 U.S. 1164, 120 S.Ct. 1182, 145 L.Ed.2d 1088 (2000). Obviously, the actual death of a murder victim is rarely captured on videotape. However, such evidence is undoubtedly probative of the issue of *corpus delicti*. We discern no error in the introduction of the videotape. Nor did the trial

court err in permitting the Commonwealth to introduce three autopsy photographs of Shalash's body for the purpose of showing the location of the fatal wounds. *Davis v. Commonwealth,* Ky., 967 S.W.2d 574, 579 (1998); *Parker v. Commonwealth,* Ky., 952 S.W.2d 209, 213 (1997), *cert. denied,* 522 U.S. 1122, 118 S.Ct. 1066, 140 L.Ed.2d 126 (1998).

### G. *Lay opinion: KRE 701.*

Morbley asserts the trial judge erred in not permitting him to introduce two statements made by Johnetta Girard during her police interrogation: (1) that she did not think Morbley knew what was going on; and (2) that the reason she did not think Morbley knew of the plan to kill Shalash was because Young later told her that when Thomas got back in the car Morbley was crying, scared, and said, "What's going on? What's going on?"

■ The second statement contained two layers of hearsay, *i.e.,* Girard testifying to what Young told her that Thomas told him, neither of which falls within an exception to the hearsay rule. Thus, the second statement was clearly inadmissible. KRE 805. Girard did not state what evidence caused her to formulate the opinion expressed in the first statement, thus, it is impossible to determine if the opinion was rationally based upon her own perceptions as required by KRE 701(a). Generally, a witness may not testify to the mental impressions of another. *Tamme v. Commonwealth, supra,* at 33–34; *Adcock v. Commonwealth,* Ky., 702 S.W.2d 440, 442 (1986). An exception occurs if the opinion is based on the witness's own factual observations or perceptions. *Tamme v. Commonwealth, supra,* at 35. We have held that the "collective facts rule" applies to this type of opinion if the witness is expressing an opinion about another's mental conditions and emotions "as manifested to that witness." *Com-*

*monwealth v. Sego,* Ky., 872 S.W.2d 441, 444 (1994). That is but another way of saying that the witness's opinion must be based on the witness's own observations. Girard did not purport to base her opinion on her own observations or perceptions of Morbley's actions and reactions. The only articulated basis for her opinion was the hearsay information furnished to her by Young. While an expert's opinion may be based on facts or data otherwise inadmissible as evidence, *e.g.,* hearsay, KRE 703(a), a lay witness's opinion must be based on his/her own personal knowledge or perceptions. KRE 701(a); KRE 602; *Mills v. Commonwealth, supra,* at 488.

## V. INSTRUCTIONS.

■ Young asserts the jury was improperly instructed that it could find him guilty if he acted in complicity with "a person" who intentionally killed Shalash instead of requiring the jury to find that he acted in complicity specifically with Thomas. Although Girard testified that Young hired Thomas to kill Shalash, Craddock did not identify the hired killer by name. Thus, the instruction permitted the jury to find Young guilty even if it disregarded Girard's testimony but believed Craddock's testimony. KRS 502.020 predicates guilt upon acting in complicity with "another person." The instruction conformed to the language of the statute, thus, was not erroneous. *Commonwealth v. Hightower,* 149 Ky. 563, 149 S.W. 971, 972 (1912); *cf. McGuire v. Commonwealth,* Ky., 885 S.W.2d 931, 936 (1994). Nor did the trial judge err in refusing to define "reasonable doubt," RCr 9.56, *Commonwealth v. Callahan,* Ky., 675 S.W.2d 391 (1984), or to give a more detailed instruction on the Commonwealth's burden of proof. *Victor v. Nebraska,* 511 U.S. 1, 5, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994); *Gall v. Commonwealth,* Ky., 607

S.W.2d 97, 110 (1980), *cert. denied*, 450 U.S. 989, 101 S.Ct. 1529, 67 L.Ed.2d 824 (1981), *overruled on other ground, Payne v. Commonwealth*, Ky., 623 S.W.2d 867 (1981).

■ There was also no error in the trial judge's failure, *sua sponte*, to include a "no adverse inference" instruction in the penalty phase instructions. That instruction is required only when requested and no request was made in this case. RCr 9.54(3); *Skaggs v. Commonwealth*, Ky., 694 S.W.2d 672, 680 (1985), *cert. denied*, 476 U.S. 1130, 106 S.Ct. 1998, 90 L.Ed.2d 678 (1986); *Ice v. Commonwealth*, Ky., 667 S.W.2d 671, 677 (1984), *cert. denied*, 469 U.S. 860, 105 S.Ct. 192, 83 L.Ed.2d 125 (1984). Furthermore, the failure to instruct the jury to draw no adverse "inference of guilt" from the defendant's failure to testify, as required by RCr 9.54(3), would be pointless where, as here, the jury had already found the defendant guilty and was only deliberating the appropriate penalty. *Compare Hibbard v. Commonwealth*, Ky., 661 S.W.2d 473 (1983), *cert. denied*, 466 U.S. 907, 104 S.Ct. 1688, 80 L.Ed.2d 161 (1984).

## VI. ALLEGED DENIAL OF DEFENSE.

■ Young asserts he was improperly denied the right to introduce evidence identifying other persons who might have killed Shalash. He claims Kim Pruitt would have testified that the "Wingate brothers" were accused of killing Anthony "Short Man" Taylor, an associate of the victim; that one of the Wingates matched Joyce Combs's description of the killer; and that the brothers were known to possess a red Cadillac. Young also asserts that Leslie Leek, another of Shalash's associates, would have testified that when the victim's father, Mohammed Shalash, was told of the murder, he responded "something to the effect of 'well, good.'" Neither of these issues were preserved by avowal, thus neither is preserved for appellate review. KRE 103(a)(2); *Commonwealth v. Ferrell*, Ky., 17 S.W.3d 520, 523 (2000). Finally, Young asserts that he was prevented from asking Kim Pruitt if Shalash had "ratted people out," implying that these unnamed others had a motive to kill Shalash. In fact, defense counsel ultimately did make this inquiry of Pruitt who responded that she had no knowledge of such facts but that Shalash was always watching his back because he was afraid of being caught by the police. This claim of error is obviously meritless.

## VII. ALLEGED DENIAL OF PRESUMPTION OF INNOCENCE.

■ There is no reason to assume that Appellants were prejudiced by being escorted into the courtroom by security personnel. Appellants were not wearing jail clothing or handcuffs, and the record does not reflect how many security personnel were involved. The jury could as well have assumed that the security personnel were there to protect Appellants from Shalash's family and friends as to protect the public from Appellants. *Holbrook v. Flynn*, 475 U.S. 560, 569, 106 S.Ct. 1340, 1346, 89 L.Ed.2d 525 (1986); *Hodge v. Commonwealth*, Ky., 17 S.W.3d 824, 839–40 (2000), *cert. denied*, 531 U.S. 1018, 121 S.Ct. 581, 148 L.Ed.2d 498 (2000). Appellant Young's complaint that a prospective juror observed him in handcuffs as he was leaving the elevator on the second day of trial is not supported by the record. The juror in question stated that he did not see Appellant leave the elevator but had been asked to leave the hallway before the elevator arrived; and that he had not discussed the occurrence with any other potential jurors. Appellants did not request

that this juror be excused for this reason. Equally meritless is Young's claim that he was denied the presumption of innocence by the fact that the prosecutor read the indictment to the jury during opening statement. The trial judge had previously read the indictment to the jury on the first day of trial and Young does not articulate why he was prejudiced by a second reading. Furthermore, there was no objection to the second reading, thus the issue is not preserved for appellate review.

## VIII. ALLEGED PROSECUTORIAL MISCONDUCT.

■ Young asserts prosecutorial misconduct in the following statement made by the prosecutor during his penalty phase argument:

> Now, under Kentucky law right now, we cannot guarantee that those two defendants will not be right back on the street. We can't do it.... We can't guarantee that they won't do it again. The public is entitled to be protected from people like Gerald Young....

■ This statement did not cross the line between legitimate argument for a severe penalty and prosecutorial misconduct. Young's other claims of prosecutorial misconduct are but unpreserved claims of error. We reiterate that unpreserved claims of error cannot be resuscitated by labeling them cumulatively as "prosecutorial misconduct." *Davis v. Commonwealth*, Ky., 967 S.W.2d 574, 579 (1998). Finally, we find no "cumulative error" that would warrant a reversal of Appellants' convictions.

Accordingly, the sentence of death imposed upon Appellant Young is vacated and his case is remanded to the Fayette Circuit Court solely for a new penalty phase, at which the jury shall be instructed that the maximum penalty that can be imposed upon him is imprisonment for life.

In all other respects, the judgments of conviction and sentences imposed by the Fayette Circuit Court with respect to all three Appellants are affirmed.

LAMBERT, C.J., GRAVES, JOHNSTONE, KELLER and STUMBO, JJ., concur.

WINTERSHEIMER J., concurs in part and dissents in part by separate opinion.

WINTERSHEIMER, Justice, concurring in part and dissenting in part.

I fully concur with the majority opinion in affirming the convictions of Thomas and Morbley. However, I must respectfully dissent from that part of the opinion which reverses the conviction as to Young because I believe the instruction as to aggravating circumstance was correct.

Although the learned majority opinion presents a plausible argument for reversal, it is not convincing. *Skinner v. Commonwealth*, Ky., 864 S.W.2d 290 (1993), a burglary case, notes that an accomplice may be liable for a confederate's aggravated offense. *Ray v. Commonwealth*, Ky., 550 S.W.2d 482 (1977), a robbery case, also supports the proposition that an accomplice may be liable for the aggravated offense of a confederate, although having no knowledge of the aggravating circumstance. *See also Commonwealth v. Yeager*, Ky., 599 S.W.2d 458 (1980), which involves an accomplice to a robbery.

*Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), a case involving a felony murder death penalty for persons who did not kill or intend to kill victims but who had a major personal involvement in the events so as to show a reckless indifference to human life was not held to violate the Eighth Amendment. The case involved the sons of an escaped

prisoner who had been convicted of murdering a prison guard.

Perhaps it is necessary for the legislature to include an aggravating circumstance in KRS 532.025(2) applicable to one who hired, procured or directed another to commit murder.